(No. 12426.—Reversed and remanded.)

GEORGE W. ALDRICH *et al.* Appellees, *vs.* JOHN C. ALDRICH
*et al.*—(HORACE ALDRICH, Appellant.)

*Opinion filed February 20, 1919—Rehearing denied April 3, 1919.*

1. SPECIFIC PERFORMANCE—*proof of an oral contract to convey
must be conclusive.* To justify a court in decreeing specific performance of an oral contract for the conveyance of land the proof must be clear and conclusive of its existence and terms.

2. SAME—*oral contract to convey need not be proved by direct
evidence.* An oral contract to convey land in return for services rendered may be proved by other than direct evidence, and where the facts, including the acts of the parties, raise a convincing implication that the contract was actually made and satisfy the court that its terms and provisions are sufficient to justify its enforcement the contract should be upheld.

3. SAME—*when taking possession and making permanent improvements need not be proved to avoid Statute of Frauds.* In establishing an oral contract to convey a farm from father to son in return for services rendered the father until his death, it is not necessary, in order to avoid the Statute of Frauds, to show that the son took exclusive possession and made permanent improvements, where the father lived on the farm with the son, who was not, under the contract, to have full possession until the father's death.

4. SAME—*when filing claim against estate will not defeat suit
for specific performance.* As a suit for specific performance of an oral contract to convey land of a decedent to his son in return for services rendered up to the father's death may not be finally decided until the year has expired for filing claims against the estate, the filing of a claim against the estate for such services is a mere legal precaution and not a confession of disbelief in the validity of the alleged contract. (*Fletcher* v. *Osborn,* 282 Ill. 143, followed.)

5. SAME—*payment of taxes by father after making alleged contract to give land to son is not decisive.* The payment of taxes on land by the owner after the making of an alleged contract to give the land to his son for services to be rendered until the father's death is not decisive of question whether such contract was made.

APPEAL from the Circuit Court of Hancock county;
the Hon. HARRY M. WAGGONER, Judge, presiding.

O'HARRAS, WOOD & WALKER, for appellant.

SCOFIELD, HARTZELL & CALIFF, MACK & MACK, and STERLING P. LEMMON, for appellees.

Mr. JUSTICE CARTER delivered the opinion of the court:

An original bill was filed by George W. Aldrich in the circuit court of Hancock county for the partition of 240 acres of land among the seven children of George H. Aldrich, deceased. A cross-bill was thereafter filed in said cause by Horace Aldrich, one of the defendants in the original bill, praying for the specific performance of an alleged contract with his father, said George H. Aldrich, for 160 acres of said land, constituting what was known as the "home farm." After the issues were joined the cause was referred to a special master to take the evidence and report his conclusions. The master reported, recommending a decree in favor of Horace Aldrich as prayed for in said cross-bill and that the original bill should be dismissed as to said 160 acres for want of equity. The trial court sustained exceptions to the master's report and entered a decree that the whole 240 acres, including the home farm 160, be partitioned as prayed for in the original bill, and the cross-bill was dismissed for want of equity at the costs of Horace Aldrich, who prayed an appeal from that decree.

George H. Aldrich died in 1913 at the age of eighty-three, owning a farm in Fountain Green township, in Hancock county, which he had owned and resided on for many years prior to his death. He left four sons and three daughters, viz., John C., George W., Horace and Stephen D. Aldrich, and Amanda Conkey, Emma Coleman and Mary Booker. All these children were married at the time of his death, and all of them had left the home place before his wife's death, in 1905, except Horace and John. John continued to live there until his marriage, when he moved to the 80-acre tract owned by his father not far from the home farm. Horace continued to assist the father on the home place. At this time, the evidence tends to show,

Horace had been married for years and his family then lived in LaHarpe, in said county, several miles from the home place. The evidence also tends to show that after the mother's death, Horace, with some assistance from his father, carried on the farm and also did the housework, cooking for both himself and his father and doing any other work necessary in order to care for the house, going to LaHarpe to visit his family occasionally; that he was doing this from the time of his mother's death until the spring of 1907. Ross Bright, who had been working for some time for them on the farm, testified that during the early part of that year he heard a conversation in the kitchen of the house on the home place between George H. Aldrich and his son Horace, to the effect that the father told Horace that if he would bring his wife and children out there and stay with him and care for him for the rest of his life he could have the farm and what personal property he had; that he wanted them to come out and stay with him and care for him and do his washing and cooking, as he was getting too old to care for himself and did not want to stay there by himself; that Horace in reply stated that he would do so, and that year moved his family and some furniture from LaHarpe out to the farm; that witness continued to work on the farm for several years thereafter. He testified further that Mrs. Horace Aldrich and her family came to the farm and took care of things, and that several times thereafter he heard Horace ask his father whether certain things should be done with reference to the farm, and the father would answer, "It belongs to you; do just as you please about it." Witness Spiker testified that he was a farmer and had known George H. Aldrich for thirty-five years; that he had seen him frequently during the last years of his life, both at LaHarpe and at the home farm; that about eight or nine months prior to Aldrich's death witness called at the home place, and during a conversation the father told him "that Horace

was the only child he had that he could live with and he calculated he had given Horace the home farm; that Horace was the only child that would come out there and take care of him; that they treated him well and that he had given the place to Horace." A score or more of neighbors and acquaintances testified to various conversations that they had had with George H. Aldrich, or that they had heard between him and others, in which he stated that the land at that time belonged to Horace, or that he was going to give it to Horace, or that he had no further interest in the farm. These witnesses testified to statements substantially as follows: "Yes, I have given him this 160 acres of land; he has been good to me;" that "when I am dead and gone this 160 acres goes to Horace;" that "he had given Horace the farm for taking care of him." Two witnesses testified that they heard the old gentleman say, in substance, that he intended to have Horace take him to town so that he (the father) could make a deed for the place, one of them stating that this was said on a morning when the old gentleman said he was going to town with Horace but was feeling so poorly he could not go. Another witness testified that the father talked to him as to whether an outlet drain ought to be made on the farm and said, "See Horace about it." Another witness was also told by the father to see Horace about certain hay on the farm; that he had nothing to do with the farm. Another witness who desired to rent some land was directed by the father to see Horace, the father stating that Horace had more land than he could attend to and perhaps would rent some of it. Some of the witnesses were directed by the father to see Horace about certain things they thought necessary to be done on the farm, these statements by the father indicating that he considered Horace was in charge and owned the land. Another witness stated that the old gentleman said to him he was "going to give Horace that quarter section of land; that Horace was the best of the bunch."

These neighbors and acquaintances, many of them, testified to other facts that indicated that during the last years of George H. Aldrich's life the farm was managed and controlled by Horace as if it was his own, although some of the facts that they testified to might be consistent with the theory that Horace was only working the farm as a tenant, as contended by appellees.

On the part of appellees ten or more witnesses testified to conversations with George H. Aldrich which indicated that he still claimed to own the home farm, and proof was offered showing that he had paid the taxes on said quarter section for the years from 1908 to 1912, inclusive. Several of the appellees testified to certain statements alleged to have been made by Horace after his father's death which would tend to show that he did not then claim that his father had given him the farm, as alleged in the cross-bill. One of these witnesses testified that Horace said that if appellees had not made trouble about a certain certificate of deposit for $2100, which he apparently had in his possession at his father's death, he would not have made trouble about the land. Other appellees testified that Horace said he intended that two of the sisters should have their share of the land but did not intend that the other children should. Another witness testified to the effect that after the father's death he was told by Horace that the land was to be sold, and that if he (the witness) desired to buy he had better go ahead and look the farm over. There is testimony, also, of other statements claimed to have been made by Horace that would be inconsistent with his claim of ownership. Most of these statements Horace denied when he took the stand in the trial court and gave evidence in rebuttal. Two of the appellees testified to hearing Horace state that he could get Ross Bright and Bright's father and two others to testify to anything for $25 apiece, and that he could prove by them that he had a contract with his father to give him the home farm.

There is much testimony found in the record as to the care given the father during the time that Horace was living with him. Most of the near neighbors testified that Horace and his wife took good care of the house and of his father, and the doctor who prescribed now and then for the father during the last eight or ten years of his life and cared for him in his last sickness, gave testimony tending to show that they took good care of the house and as good care, under the circumstances, as could be given to an old man in that physical condition, and there is no testimony by any of the near neighbors to the contrary, although there is testimony by some of the appellees that the house was frequently in a very unsanitary condition when they were out there visiting and that the father did not receive proper care by Horace and his wife. There is no testimony by anyone that the father ever complained that he was not receiving proper care or ever wanted to leave or have Horace and his wife leave the place. On the contrary, the evidence is all to the effect that he appeared satisfied with his care and treatment. One of the sons who lived and practiced dentistry in LaHarpe asked a doctor from Macomb, in 1910, to go out to the home place to visit his father, apparently to see if he was properly cared for. This doctor's testimony tended to show that the house was not in a very clean condition and that the old man did not seem to have his person properly cared for, but he also testified that he tried to get him to go to Macomb to be cared for in a hospital of which witness was superintendent, and that the old gentleman said he would not go; that he was satisfied where he was. The testimony on this as on many other questions in the case is sharply conflicting, as it is also relative to the father's health during the last few years of his life, counsel for appellees contending that he was never so ill that he could not care for himself except in the last two or three weeks before his death, while counsel for appellant contend that he was very feeble from the time

of his wife's death until his own.   The evidence shows that
he had his bed in the kitchen of the home place; that he
laid down a good deal of the time, very frequently during
the day, usually with his clothes on and sometimes with
his shoes on; that he was troubled very badly with rheu-
matism; that he had to have assistance in taking off his
clothes, especially his shoes; that this was frequently given
by his son Horace; that he did not take good care of his
person; that during the years that Horace and his wife
lived with him he frequently would go out to the back
porch, and no farther, to attend to the calls of nature, and
that thereafter Horace or his wife would have to clean
the porch.

It is earnestly contended by counsel for appellees that
Horace's wife and family did not come to live on the place
until 1910 or 1911, while it is just as strongly contended
by counsel for appellant that she came in 1907 and re-
mained there until the father's death.   Appellees contend
that the wife lived in LaHarpe until 1911, and there is evi-
dence tending to show the payment of rent by appellant
for a house in LaHarpe for a short time as late as 1908
and the death of one child and birth of another while Mrs.
Horace Aldrich was in LaHarpe.   It is further contended
by counsel for appellees that Horace and his wife were
not married until after the father's death, and that there-
fore the agreement alleged in the cross-bill has not been
proved.   To prove this they introduced the certificate of
a marriage between Horace Aldrich and Elizabeth Sights,
both of Blandinsville, McDonough county, Illinois, solem-
nized in Clark county, Missouri, February 6, 1913, before
a justice of the peace.   There is no evidence in the record
that either Horace or his wife had ever lived at Blandins-
ville, in McDonough county, although apparently the home
farm is about as near Blandinsville as it is to LaHarpe.
The evidence in the record shows that the wife of Horace
was known by the name of Mabel and not Elizabeth, and

the appellees did not introduce any testimony to prove that Horace Aldrich, the appellant, was the Horace Aldrich mentioned in the marriage certificate. The evidence shows that the parents of Mabel Sights, the wife of Horace, lived in LaHarpe, in Hancock county, and had lived there for years. The evidence also tends to show that Horace and his wife had lived together as man and wife, either in LaHarpe or on the farm, from about 1901 or 1902 down to the time of the death of Horace's father; that they had had five children born to them, three living at the time of this hearing, some of them born while they lived in LaHarpe, before 1905, and one born while the wife was staying temporarily in LaHarpe while they resided on the farm with the father. While there is evidence by appellee John C. Aldrich that Horace told him after they moved to the farm that he had never been married to his wife, there is no evidence outside of this marriage certificate that in any way tends to corroborate this statement of John's. We think the great weight of the evidence is to the effect that they had been living together as man and wife from 1901 or 1902 until the time of this hearing, and while there are some inconsistencies in the testimony, both for and against the claims of opposing litigants, as to whether or not they were married, as argued by counsel for appellees and appellant, we have no doubt, on this record, that if the only question at issue were whether or not Horace was married at the time of the alleged contract, in 1907, that question should be decided in favor of the enforcement of the alleged contract.

It is undoubtedly true that Horace Aldrich's wife and children were in LaHarpe after 1907, temporarily, for varying periods of time, but we do not consider the facts as shown in this record as so irreconcilable with the alleged contract as to be controlling or decisive that appellant had not carried out the contract as to bringing his wife and family out there and caring for his father until his death. The great weight of the testimony, as found in the record,

tends strongly to show that Horace moved some furniture and brought his wife and two children to the farm in 1907, and that his wife remained there, looking after the household affairs, practically all the time until the father's death. The evidence relied upon by counsel for appellees as not in harmony with this we think is either unreliable or entirely consistent with the testimony on behalf of appellant to the effect that the wife stayed for various special reasons in LaHarpe for short periods of time after 1907.

Counsel for appellees strenuously insist that appellant's statements and actions after his father's death were, many of them, inconsistent with his claim that he had a contract with his father for the 160 acres. Conceding that there is testimony in the record as to certain of these statements that tends to support this argument, we can reach no other conclusion from this record than that all of appellees fully understood from the time of the father's death that Horace claimed the home farm. Indeed, in their original bill for partition filed in this case they alleged that he was the only heir who refused to meet and discuss with the others the matter of the partition of said premises, and the answers of some of the appellees to the original bill contain statements in harmony with this allegation.

Counsel differ as to the value of the home farm. No specific proof is found in the record as to what the land was worth. Counsel for appellees claim it was worth $100 an acre at the time of the trial, while counsel for appellant insist that it was not worth that amount, but argue that even if it was worth that amount at the time of the trial it was worth much less at the time the contract was entered into, and that this court has held that if a contract was fair and equitable when it was made it could not become unfair and inequitable by circumstances which might afterwards arise. (*Dalby* v. *Maxfield,* 244 Ill. 214.) Considerable evidence was introduced tending to show that the father and Horace were accustomed to use intoxicating

liquors to excess. The evidence also tends strongly to show that at the time of the trial appellant had entirely ceased the use of any intoxicating liquors. We do not think this evidence has a material bearing on the vital issues in this case.

To justify a court in decreeing specific performance of an oral contract for the conveyance of land the proof must be clear and conclusive of its existence and terms. (*Reynolds* v. *Wetzler,* 254 Ill. 607; *Rotes* v. *Rotes,* 277 id. 183.) While an oral contract of this kind, and all of its terms, must be clearly and satisfactorily proven, we think the weight of authority is that such a contract may be proved by other than direct evidence; that where the facts, including the acts of the parties, raise a convincing implication that the contract was actually made and satisfy the court that its terms and provisions are sufficient to justify its enforcement it should be upheld. (*Willis* v. *Zorger,* 258 Ill. 574, and cases cited.) In this case we not only have circumstantial evidence and the statements of the deceased which tend strongly to show that such contract was made, but we have the direct evidence of witness Bright, whose testimony, in our judgment, stands unimpeached as to an actual contract having been made between the father and son. There is nothing unreasonable as to the terms of this contract as stated by Bright. They are similar to those that are frequently made between a parent and child to obtain the child's care and assistance in the last years of the parent's life. The weight of the evidence tends strongly to show that the terms of the contract as stated by witness Bright were carried out by appellant and his family satisfactorily to the father during all of his life, and his own statements, sworn to by twelve or fifteen unprejudiced witnesses, fully support the testimony of Bright as to the terms of the contract. We do not find any actual variance between the allegations of the cross-bill on this point and the proof, as contended by counsel for appellees. If there was a contract for the conveyance of this land,

as alleged in the cross-bill and as proved by the evidence in the record, it has been fully performed by appellant, and from the evidence before us we are compelled to conclude that appellant could not be recompensed for his services to his father except by specific performance of the contract as prayed for in the cross-bill.

Counsel for appellees also argue that possession was not taken by appellant under the contract and that no permanent improvements were made by him, and that it is necessary to show that possession was taken and such permanent improvements were made in order to enforce an oral contract of this nature. In *Warren* v. *Warren,* 105 Ill. 568, this court considered the question of possession and improvements and said that the plaintiff in error in that case had possession so far as the premises were capable of being possessed under the circumstances of the case, and it was there said also that it was not indispensable to a part performance that permanent improvements be made in order to take the case out of the operation of the statute. This doctrine was approved on both of these points in *Gladville* v. *McDole,* 247 Ill. 34, and *Dalby* v. *Maxfield, supra.* In neither of these cases was the complainant entitled to possession until after the death of the other party to the contract, and in neither of them did the complainant have, nor could he have, possession under the contract before the death of the parent, as that would have been contrary to the terms of the contract, as it is here. Under the reasoning of these cases we consider the argument of counsel for appellees on these points without merit.

. It is argued by counsel for appellees that the conclusion that a contract was made is not in harmony with the testimony that the father paid the taxes, or the fact that the appellant and his wife, after filing this cross-bill, filed claims for their services in taking care of the father during the last years of his life, in the county court of Hancock county, against the estate of the deceased. Conceding that their ar-

gument on these points has merit, neither of these facts is controlling as to there being such a contract. It was held in *Anderson* v. *Manners,* 243 Ill. 405, that the payment of taxes by the original owner subsequent to the making of the alleged contract for conveyance of the land was not decisive. It was also held in the recent case of *Fletcher* v. *Osborn,* 282 Ill. 143, that the filing of a claim against the estate of the deceased was not conclusive that no oral contract for the conveyance of the land by the deceased had been entered into. It was there stated that while the filing of such claim against the estate of the deceased was inconsistent with his claim that he owned the property upon the death of the deceased, the claimant may have realized that it might be difficult to make the required proof of a contract of that kind, and determined, in the event he failed to prove the contract, to secure some remuneration for the services that he had performed. The same may be said here. Then, too, it is quite possible that the filing of the claim was done under the advice of counsel, and was not caused, alone, because appellant doubted whether or not he had a contract with his father for the conveyance of the land. A claim against the estate of a deceased person must be filed within a year after the date of letters of administration or letters testamentary, and as a case such as this might not be finally decided until after such year was up, the filing of such a claim against the estate is a mere legal precaution and not a confession of disbelief in the validity of the alleged contract.

The evidence in this case, as frequently happens in contests of this kind, is very conflicting and in many respects inconsistent with the claims and arguments of both parties. There is merit in the argument of counsel for appellant that some of the testimony of appellees, on account of their interest in this litigation, was incompetent. Regardless of this question, we think that, considering all the evidence in the case and the character and opportunity of the wit-

nesses to know the facts, the weight of the evidence supports strongly the conclusion that an oral contract was actually made by the father with this son and carried out by the son, as heretofore stated.

The decree of the circuit court is reversed and the cause remanded, with directions to dismiss the original bill as to the 160-acre home farm and grant the relief prayed for in the cross-bill.    *Reversed and remanded, with directions.*