(No. 12474.—Decree affirmed.)

JAMES A. WEIR, Plaintiff in Error, *vs.* WILLIAM H. WEIR, Defendant in Error.

*Opinion filed April 15, 1919.*

1. SPECIFIC PERFORMANCE—*a verbal contract for conveyance of land must be certain and unequivocal.* A verbal contract for the conveyance of land, to be capable of enforcement in equity, must possess all the elements and features necessary to the specific performance of any agreement and must be certain in its terms.

2. SAME—*mere declarations of promisor not sufficient to establish oral contract to convey.* Mere declarations of the promisor do not constitute such clear and unequivocal testimony as is necessary to establish the existence of an oral contract to convey land.

3. SAME—*what part performance is necessary to take oral contract to convey out of Statute of Frauds.* An oral contract for the conveyance of land will not be enforced in equity unless the promise has been acted on by the taking of possession and the expenditure of money in making improvements by the person requesting such enforcement, and such acts must be definite and referable exclusively to the contract.

4. SAME—*when equity is not justified in decreeing specific performance of oral contract to convey.* Where the evidence of an oral agreement to convey, in return for services rendered the alleged grantor until his death, is not of a clear, conclusive and undoubted character and compensation for the services rendered may be had by filing a claim against the estate, a court of equity is not justified in decreeing specific performance of the alleged agreement.

5. SAME—*admission of additional evidence after case is closed rests in discretion of court.* The question as to whether further evidence shall be allowed after a party has closed his case rests largely in the sound discretion of the trial court, and rulings thereon will not be disturbed unless palpably erroneous.

WRIT OF ERROR to the Circuit Court of Shelby county; the Hon. WILLIAM B. WRIGHT, Judge, presiding.

CHAFEE, CHEW & BAKER, and E. A. RICHARDSON, for plaintiff in error.

KELLEY & KELLEY, and FRANK T. CARSON, for defendant in error.

Mr. JUSTICE CARTER delivered the opinion of the court:

The original bill was filed in this case to perpetuate testimony. Later an amended bill was filed setting up an alleged oral agreement between plaintiff in error and his grandfather, James Weir, whereby the plaintiff in error claimed that he purchased a certain 80-acre tract of land in Shelby county from his grandfather in March, 1913, and immediately thereafter took possession thereof and was still in possession and had made lasting and valuable improvements thereon; that this contract was a verbal one, to the effect that the grandson was to farm and cultivate said 80 acres and to pay his grandfather, yearly, a certain sum as long as the grandfather should live; that his grandfather was to pay the taxes out of said yearly payment, and that plaintiff in error was to care for him, prepare his meals, provide for his washing and mending and permit him to live with plaintiff in error and his family, as a member thereof, as long as the grandfather should live; that his grandfather resided with plaintiff in error, in compliance with the terms of said contract, from its date until his death, January 16, 1916; that plaintiff in error fully and completely complied with the terms of said oral contract, and he prayed for specific performance thereof and for the conveyance to him of said 80 acres. The matter was referred to the master in chancery to take evidence and was reported by him. The case was then argued before the chancellor and a decree entered dismissing the amended bill for want of equity. This writ of error was then sued out.

James Weir was the father of defendant in error, William H. Weir, and the grandfather of plaintiff in error, James A. Weir. For convenience James will be called the grandfather and James A. the grandson. At the time of his death the grandfather was about eighty years old and held the record title to the 80 acres in question. The evidence tends to show that the farm was then worth about $12,000 and at the time of the hearing was worth close to

$16,000. Defendant in error was the only son and sole heir, and he and his family had been living on and caring for his father on said land for a number of years previous to 1913. The evidence on behalf of plaintiff in error tended to show that the grandfather had lived on the farm for these years under substantially the same contract as the grandson alleged he made when he went to live with his grandfather, but that William and his father could not get along well together, the grandfather claiming that William did not treat him right, swore at him and called him vile names and in other ways had abused him, while William claimed that because he and his father could not get along well together he left the farm; that he was living on his father's farm all these years prior to 1913 under a lease and did not have any agreement with him that the farm should be his after his father's death; that one cause of his trouble with his father was the actions of two of his sons, plaintiff in error and a brother, who were keeping horses on the place against the grandfather's protest; that his father told him that if the boys did not leave the place he (William) would have to give up his lease. The evidence on behalf of plaintiff in error tends to show that some time before William left the place plaintiff in error was living in the west and came back to take care of his grandfather at the grandfather's request, with the sanction and approval of William. There is testimony of some of the neighbors, but denied by defendant in error, to the effect that William said, in their presence, that the grandfather would have to be cared for by someone and would doubtless give the farm, at his death, to the one who was caring for him, and that plaintiff in error might better have the farm than a stranger. The evidence shows, without contradiction, that when William left the farm, in 1913, plaintiff in error came onto the farm and cared for the grandfather and that William moved west and continued to reside there until the grandfather died, in 1916.

287 – 32

A number of witnesses testified on each side as to the principal issues of the case. Some nine witnesses testified in behalf of plaintiff in error concerning conversations in which the grandfather said he intended the grandson to have the 80 acres. Certain of these witnesses stated that the grandfather said at the same time that he had the same arrangement or contract with his grandson as he had had with defendant in error, William, prior to 1913, but that he could not get along with his son, and that plaintiff in error had taken up the contract and was going to carry it out in accordance with what William had agreed to do; that William had caused the grandfather to pay out a lot of money by going security on his debts and had not treated him as a son ought to treat his father, and that the grandfather had always been treated fine since the grandson came to the farm. To others of these witnesses he stated that he thought the farm would make plaintiff in error a nice home; and to still others the old gentleman stated that plaintiff in error furnished him good meals and kept his clothes clean and in good shape. Some of these witnesses who had lived on the farm with the plaintiff in error and his grandfather had heard the grandfather talk frequently about these matters and say that the home was kept in good shape by plaintiff in error; that he (the grandfather) was to pay the taxes, and that the grandson was to pay him enough from the sale of the crops to pay these taxes, properly care for him and give him all the spending money he needed. Certain of these witnesses also stated that they had heard the grandfather state several times that the plaintiff in error had entire charge of the farm and that he had nothing to say about it. Four witnesses testified to conversations with the grandfather in which he said that he had given plaintiff in error the farm.

Some seven or eight witnesses testified in behalf of defendant in error to conversations had with the grandfather to the effect, or to facts indicating, that plaintiff in error

was only renting the place. The doctor who treated the grandfather during his last illness testified that the day before the grandfather died he talked to witness about his business affairs and said he had not made up his mind what to do with his property; that he wanted to dispose of it in such a way that each one of his relatives would have an equal share, the relatives being William and his four children. The doctor also testified that the grandfather asked him to bring somebody there in the morning to write a will, but that when he came back in the morning the grandfather was dead. There is also testimony by a neighbor,— a retired farmer and former minister,—to the effect that the grandfather had told him, in the presence of two or three witnesses, who also testified to the same effect, that he had never been able to fully decide what he wanted to do about his property; that he said to him at one time that he had decided to give the farm to the grandson if he would not mortgage it and would pay defendant in error $400 a year for his support; that he did not want to disinherit his only son but could not trust him to care for the property. Mrs. Graves, a married sister of plaintiff in error, testified that the summer before the grandfather died plaintiff in error told her that he was having trouble with his grandfather about renting the place for another year; that the grandfather was out of humor with him; that plaintiff in error asked her to get the grandfather to come and visit her and get him in a good humor so he would rent the place to him; that she talked with her grandfather about renting the place to plaintiff in error for another year, and the grandfather said he did not know that he wanted to do it unless plaintiff in error would agree, by written contract, that there would be no liquor allowed, no vulgar or profane language used or any dogs kept on the place; that she told her brother what her grandfather wanted, and plaintiff in error said he would sign that kind

of a contract and to ask the grandfather to get it ready at once, and when she told that to the grandfather the latter said it would do the grandson good to sweat a little about it. Plaintiff in error denied having this conversation with his sister. There is also some testimony by several witnesses on behalf of defendant in error to the effect that plaintiff in error stated that the grandfather was paying him out of the income of the farm weekly for taking care of him.

There were offered in evidence on behalf of defendant in error certain letters of plaintiff in error written both before and after the grandfather's death,—one in May, 1914, to his father, stating, "I don't know whether I will stay another year or not," mentioning that he was in debt, and that if he had the money he would send defendant in error a car with his goods. Again, July 6, 1915, he wrote to his father: "What do you think of renting me the place next year? What kind of rent do you want?" Again, on February 25, 1916: "I am almost sure there ain't no will or it would have showed up before now, so I am fully satisfied there ain't no will; I have looked for one but can't find it; if you will rent me the place for five years I will build a fence myself." Several other letters were introduced which intimated that plaintiff in error did not rely on having a contract for the 80 acres, as alleged in the bill in this case. Counsel for plaintiff in error argue that these letters can be accounted for consistently with the alleged contract, because plaintiff in error was entirely ignorant of the fact that he was legally entitled, after his grandfather's death, if there was no will leaving the property to him, to enforce the oral contract; that he had been told repeatedly by defendant in error that he could not enforce it. There is testimony showing that defendant in error told plaintiff in error, after the grandfather's death, that he could not enforce his contract if he had no writing by will or deed.

Plaintiff in error was made administrator of his grandfather's estate. Defendant in error contends that this was done at the request of plaintiff in error, who consulted attorney Ames, a former judge, with reference to his duties in connection with the administration of the estate, and it appears that he did not tell the attorney anything about claiming the 80 acres under the oral contract. There is also evidence, including some of the letters written by the plaintiff in error, tending strongly to show that plaintiff in error paid his grandfather rent for the place. Immediately after the grandfather's death plaintiff in error asked certain people who were at the residence to examine the contents of a bureau drawer in which the grandfather kept his papers and see if there was anything there that ought to be preserved, stating that he did not want any of his relatives to say he had been destroying any papers that they should know about. In this connection there is also some testimony tending to show that plaintiff in error stated that previous to that he had taken a note from his grandfather's papers, which he had given the grandfather for money loaned.

A verbal contract for the conveyance of land, to be capable of enforcement, must possess all the elements and features necessary to the specific performance of any agreement, except the written memorandum required by the statute. (4 Pomeroy's Eq. Jur.—3d ed.—sec. 1409, note 1.) Such a contract, to be in force, must be certain and must be concluded,—that is, the parties must have "agreed on the same terms and mutually signified their assent to them. If what passed between them was but treaty or negotiation, or an expectation of a contract, or an arrangement between them of an honorary nature, no specific performance can be had." (*Tryce* v. *Dittus,* 199 Ill. 189.) The rule is settled in this State that a parol contract for the conveyance of real estate will not be specifically enforced in a court of equity unless it appears to be certain, definite and

unequivocal in its terms; that to take it out of the Statute of Frauds on account of part performance all acts performed thereunder must be clear and definite and referable exclusively to the contract; that the proof upon which the conveyance is asked must be established so convincingly as to leave "no reasonable doubt in the mind of the court." (*Lonergan* v. *Daily,* 266 Ill. 189, and cases there cited.) It has also been held that mere declarations of the promisor or donor do not constitute such clear and unequivocal testimony. (*Worth* v. *Worth,* 84 Ill. 442; *Geer* v. *Goudy,* 174 id. 514.) It is also a settled rule in equity that such a contract for the conveyance of land will not be enforced unless the promise has been acted on by taking possession of the land and there has been an expenditure of money in making improvements by the person requesting such enforcement. *Ranson* v. *Ranson,* 233 Ill. 369; *Richardson* v. *Lander,* 267 id. 181; *White* v. *White,* 241 id. 551; *Lonergan* v. *Daily, supra.*

It is contended by counsel for plaintiff in error that he took possession of the farm under the contract and made valuable and lasting improvements, such as building a shed, deepening the wells, digging up many rods of a hedge fence and building other fences, while counsel for defendant in error just as earnestly argue that the evidence tends to show clearly that he did not take possession under the alleged contract and that he did not make any valuable and permanent improvements but only such as a tenant living on a farm would naturally make in properly caring for the farm. "Nothing is to be considered as a part performance which does not put a party in a situation which is a fraud upon him unless the agreement be fully performed." (2 Story's Eq. Jur.—14th ed.—sec. 1047.) "In equity the rights and duties of the parties are the same as they would have been if the contract had been written and signed, and unless the one who has performed the contract in good faith can be made whole in damages he is left without any adequate

remedy at law, and equity will compel the other party to do the thing which was agreed to be done. (Citing authorities.) Payment of purchase money, alone, will not take the contract out of the statute, for the reason that it can be recovered back, with interest, in an action at law. (*Temple* v. *Johnson,* 71 Ill. 13.) The same is true of personal services, which can be estimated in money, for which a recovery can be had in law, because the law would in that case afford a sufficient remedy. In this case there could be no recovery at law for the labor, sacrifices and deprivations of Eva Gladville during ten years of service, which were worth as much as the land was then worth, for the reason that any claim for them was outlawed by the Statute of Limitations long ago. The mere fact of possession, without other circumstances, would not justify a decree for a specific performance, and in most cases the use of the land would be a full compensation for all injuries sustained. The basis for relief in a court of equity is the equitable fraud resulting from setting up the Statute of Frauds as a defense, and there have been many cases in this court where equity has afforded a remedy by specific performance if the contract has been performed by one party in such a way that the parties cannot be placed *in statu quo* or damages awarded which would be full compensation." *Gladville* v. *McDole,* 247 Ill. 34; see, also, to the same effect, *Dalby* v. *Maxfield,* 244 Ill. 214, and cases there cited.

The case of *Fletcher* v. *Osborn,* 282 Ill. 143, strongly relied on by plaintiff in error, is of the same character as the cases last cited, as in that case, if specific performance had not been allowed, there was no adequate remedy at law for Fletcher, who had given the deceased thirty-eight years of service in part payment of the purchase price of the land in question. No such situation is presented here. Plaintiff in error had lived on the place only three years.

It is contended by counsel for defendant in error that the proof shows that the plaintiff in error had been amply

compensated for his services by the crops raised on the farm, which had been given him by the grandfather, and that the grandfather had also paid him in money for his board. Whether this be true or not, we think it is clear that plaintiff in error had ample remedy in law for his services during those years by filing a claim against the estate of the deceased. Furthermore, we do not think the evidence is of such clear, conclusive and undoubted character as to the terms of the contract as to justify equity in compelling a specific performance of the same.

Counsel for plaintiff in error urge that the chancellor erred in not permitting plaintiff in error to introduce additional evidence as to the nature and terms of the contract on the hearing before the court. It appears from the record that it was understood, originally, that plaintiff in error was to close his evidence in September, 1917, and later was given additional time, by agreement, until January, 1918, and did not, as a matter of fact, complete his evidence until March, 1918, and that the additional evidence in question was offered in April, 1918. The question as to whether further evidence should be allowed is one that rests largely in the sound discretion of the trial court, and rulings thereon should not be overruled unless palpably erroneous. In view of the record before us we cannot say that the ruling as to not admitting this evidence was erroneous. Moreover, the evidence offered appears to have been largely of a cumulative character, and if it had been introduced we do not think it would have changed the conclusion reached that plaintiff in error's proof was not of such a character as to justify specific performance of an alleged agreement for the conveyance of the land here in question.

Other questions are raised in the briefs as to erroneous rulings on the admission and exclusion of testimony and as to the competency of certain testimony given by plaintiff in error and defendant in error personally. Regardless of

the question whether all this testimony complained of was competent, we think the conclusion of the chancellor is justified by the clearly competent evidence, and we do not deem it necessary to consider in detail the other questions raised in the briefs.

The decree of the circuit court will be affirmed.

*Decree affirmed.*