(No. 12963.—Decree reversed.)
BELLE CRAWLEY, Admx. Appellee, *vs.* MINNIE HOWE,
Appellant.

*Opinion filed December 17, 1919—Rehearing denied Feb. 5, 1920.*

1. SPECIFIC PERFORMANCE—*basis for equitable relief on ground of part performance.* To authorize equitable relief on the ground of part performance of an alleged oral contract to convey land, the acts relied upon as part performance must be such that the alleged promisee would suffer injury amounting to fraud if the Statute of Frauds were allowed to be interposed as a defense to the bill for specific performance.

2. SAME—*proof of alleged contract and of the acts of part performance must be clear.* While in the case of an alleged oral contract by a father to convey land to his son, with whom he was residing on the land, it is not necessary to prove exclusive possession by the son or the making of lasting and valuable improvements, yet it is essential that the contract itself and the acts relied upon as part performance be established by clear and satisfactory evidence, and it is not sufficient to show, merely, that the father intended the son to have the land at the father's death.

APPEAL from the Circuit Court of Douglas county; the Hon. FRANK H. BOGGS, Judge, presiding.

S. S. DuHAMEL, JOHN H. CHADWICK, and P. M. MOORE, for appellant.

DOBBINS & DOBBINS, and W. THOMAS COLEMAN, for appellee.

Mr. JUSTICE FARMER delivered the opinion of the court:

This is an appeal from a decree granting certain relief to complainant in a bill filed by Belle Crawley, individually and as administratrix of the estate of Frank Crawley, deceased, against Minnie Howe, individually and as administratrix of the estate of Thomas Crawley, deceased.

Thomas Crawley was the owner of 95 acres of land in Douglas county,—an 80-acre tract, and a 15-acre tract lying east of and adjoining the north 40 of the 80. The

residence and buildings were on the south 40 of the 80-acre tract. He had been a widower for many years. He had two children,—Minnie Howe and Frank Crawley. Both were married but neither had any children. Frank Crawley died in August, 1917, leaving a widow, Belle Crawley, surviving him. Thomas Crawley died in May, 1918, leaving his daughter, Minnie Howe, his only heir surviving him. Afterwards Belle Crawley, individually and as administratrix of her deceased husband, filed the bill in this case to enforce the specific performance of a contract alleged to have been made between Thomas Crawley, Frank Crawley and Belle Crawley in 1912, by virtue of which it is claimed Belle and Frank Crawley became the equitable owners of a certain interest in land of Thomas Crawley and entitled to possession thereof at his death. Frank Crawley at the time of his death, and his wife, Belle Crawley, were living on the farm of Thomas Crawley and farming it as tenants, and he had a room in the residence and was living with his son. Frank had, previous to 1909, occupied and cultivated the farm several years, during which time his father lived in the house with him. About the year 1909 he moved to Tuscola, where he lived and conducted a meat shop about two years. He then moved to the Wheatley farm, in the same county. That was a farm of 350 acres and was leased by the owner to William Smith and Harry Smith, brothers of Belle Crawley. By some arrangement between Frank Crawley and the Smiths, Frank moved into the residence on the farm, farmed or helped farm part of the land, and his wife kept house for the three men, her brothers both being single men. Belle Crawley and her husband, now deceased, were living on the Wheatley farm in 1912, when the bill alleges Thomas Crawley came there and told his son and his wife he desired them to move to his farm, rent and care for it, and allow him, Crawley, to board with them. The bill alleges complainant and her husband declined to accept the proposition, and that subsequently Craw-

ley, to induce them to rent and move upon his farm, promised if they would do so and "occupy the same and furnish him, the said Crawley, a place to board in his own house on said farm as long as he desired to stay thereon, he would rent the said farm to complainant and her husband as long as he should live and would pay the complainant a reasonable compensation for his board and washing, and at the time of his death give to the said Frank Crawley and complainant, Belle Crawley, either by deed or will," the south 40 of the 80, that being the tract on which the residence was situated, and would provide by will enough money for complainant and her husband to equal the value of one-half the 15-acre tract. Crawley then stated he intended to give his daughter, Minnie Howe, 55 acres of the farm. The bill alleges complainant and her husband accepted the proposition, moved upon the farm, resided there until the death of Frank Crawley, paid the rent, furnished a home for Thomas Crawley, who paid a reasonable compensation for his board and washing, until about five years prior to the death of complainant's husband, and from that time on he continued to reside with complainant and her husband and board with them but did not pay any compensation for his home and board. The bill further alleges that complainant and her husband, relying upon the promises of Thomas Crawley, improved the premises agreed to be conveyed to them by placing thereon lasting and valuable improvements; that about five years before the death of Frank Crawley, Thomas Crawley informed him and complainant that he had made out the necessary papers to comply with his agreement and had deposited a deed with some responsible person to be delivered at the time of his death. The bill further alleges that complainant believes a deed or will was executed and left in the possession of a bank or banker in Tuscola, but she has been unable to secure it or information of its contents. By virtue of the alleged contract complainant claimed to be the equitable owner of the undivided one-

half of the 40 acres where the residence is located; that as surviving widow of Frank Crawley she is entitled to homestead and dower in the remaining undivided one-half of said 40 acres and as administratrix of the estate of Frank Crawley she is entitled to a lien on the remaining one-half of said premises belonging to Frank Crawley; that, subject to the payment of debts and the homestead and dower interest of complainant, the undivided one-half is owned by complainant and Minnie Howe as tenants in common in equal portions; that complainant and the heirs of Frank Crawley are entitled to a deed conveying the premises, and it is further claimed complainant is entitled to the sum of $2500, the reasonable value of one-half of the 15-acre tract of the Thomas Crawley farm. The bill prayed that the contract be decreed to be specifically performed and for partition and assignment of homestead and dower, and that the administratrix of Thomas Crawley be decreed to pay complainant $2500, or whatever sum the court should find to be the reasonable value of one-half of the 15-acre tract, and also the sum of $1000 due and owing complainant for board furnished Thomas Crawley and which was not paid by him.

Minnie Howe, individually and as administratrix, answered the bill, specifically denying there was ever any contract made as alleged, denying performance as alleged, and denying any indebtedness to the estate of Frank Crawley. The answer pleaded and relied on the Statute of Frauds.

The case was referred to the master in chancery to hear and report the testimony, with his conclusions. The master reported recommending that the bill be dismissed for want of equity. The chancellor sustained certain exceptions to the master's report and entered a decree vesting title to the undivided one-half of the home 40 acres in complainant and denied all other relief prayed in the bill.

Thomas Crawley was about eighty-three years old at the time of his death. After complainant and her husband

moved from the farm, in 1909, he rented it to others and lived with the tenants on the place most of the time. He had a room in the farm residence, which was furnished with his own furniture. For some years his habit was to spend his winters in Florida, going there in December and returning about April. The complainant and her husband moved to the farm in the spring of 1913, as complainant claims pursuant to Thomas Crawley's promises to give them the home 40 acres and the value in money of one-half the 15-acre tract. The bill alleged complainant and her husband made valuable and lasting improvements on the land, but the proof did not sustain that allegation and counsel for complainant now say that may be disregarded. They say the contract was for personal services to Thomas Crawley, and that proof of possession under the contract and the making of permanent and valuable improvements was not necessary to take the case out of the Statute of Frauds.

Courts will enforce performance of oral contracts to convey land in return for services rendered where they are sufficiently proved, and where the contract is between father and son it is not necessary, in order to avoid the Statute of Frauds, to prove exclusive possession and the making of valuable and permanent improvements, especially where by the contract possession was not to be given till the owner's death. (*Aldrich* v. *Aldrich*, 287 Ill. 213; *Dalby* v. *Maxfield*, 244 id. 214.) Where the contract in such case has been performed by the promisee, a court of equity will not permit the Statute of Frauds to be used to accomplish a fraud. The basis for equitable relief is, that performance on the part of one claiming the benefit of the contract would cause him to suffer an injury amounting to a fraud if the statute be interposed as a defense. The cases in which this rule has been applied are usually cases where the party who has performed the contract has no remedy at law to be made whole in damages and his only remedy is to compel the performance of that which was agreed to be done.

(*Gladville* v. *McDole,* 247 Ill. 34.) The contract and its performance by the party seeking to enforce it must be proved by clear and satisfactory evidence. *Aldrich* v. *Aldrich, supra; Corbly* v. *Corbly,* 280 Ill. 278; *Geer* v. *Goudy,* 174 id. 514; *Worth* v. *Worth,* 84 id. 442.

The proof principally relied upon to establish the making of the contract is the testimony of Mrs. Bowers, Harry Smith and William Smith, brothers of complainant, who were the lessees of the Wheatley farm and resided in the same house with complainant and her husband on that farm in 1912. Mrs. Bowers testified she lived with complainant and her husband several years before her marriage and that she was living with them on the Wheatley farm the year before they moved to the Crawley farm. She testified that after Thomas Crawley returned from Florida in 1912 he went to the Wheatley farm, where complainant and her husband were living, stayed about a week and then went to Minnie Howe's. The witness heard a conversation between Thomas Crawley, complainant and her husband during his stay at their home, about their going back to the Crawley farm. Crawley said if they would move back on his farm he would make them a deed to the home place and that they would get money for the 7½ acres. Complainant and her husband would not accept the proposition as they did not like to leave where they were. They said they would have to sell off stock they had bought, and they did not feel like selling off and moving to the Crawley farm. Crawley then said he would have to sell the place and get a room in a hotel. Later in the summer he came back and said he would make them a deed and leave it for them to get at his death, and that he would leave the deed at the bank. Complainant and her husband agreed to move to the Crawley farm and did so. Witness heard Crawley say he had made the deed and it was in the bank for them. Witness did not live with them then but visited them. Crawley made his home with them and complainant did his washing and cared

for him.　He said they were to pay as rent for the farm one-half the crops and $20 or more for the pasture.

　　Harry Smith, brother of complainant, testified that he, his brother Will, complainant and her husband were living together on and farming the Wheatley farm in 1912.　Witness and his brother were unmarried and complainant did the housekeeping and cooking for them.　In April, 1912, Thomas Crawley came to the Wheatley farm. . At that time he was staying with his daughter, Minnie Howe.　He told complainant and her husband if they would move on his farm and let him make his home there he would deed them the home 40, and said they could pay as rent one-half the crops and he would pay board.　Complainant and her husband made no reply.　At a subsequent time, at the same place, witness heard another conversation between the same parties.　Crawley said nothing about making a deed that time.　Witness heard a conversation after the first one he mentioned, in which Crawley spoke of making a deed to complainant and her husband for the south 40 acres of the farm if they would move there.　He said he would leave the deed in the vault.　He said something about giving them money for the 7½ acres.　Complainant and her husband moved on the Crawley farm in the spring of 1913.　They were to pay as rent one-half of the crops and Crawley was to make his home with them and pay board.

　　Will Smith, brother of complainant, testified Thomas Crawley lived most of the time with complainant and her husband on the Crawley farm several years prior to 1910. Crawley visited the Wheatley farm in 1912.　Witness heard a conversation between him and complainant and her husband in July or August.　Crawley asked them to move back to his farm so he could make his home with them.　He said he would make a will and give them the 40 acres the improvements were on.　They said they would study over the matter.　Afterwards he and the complainant and her husband had another talk.　He said he had made his will leav-

ing them the 40 which had the improvements on it and left
the will in the bank. He also said he would make them a
deed and leave it at the bank. When he spoke about mak-
ing a will he talked about leaving the complainant and her
husband an amount of money equal to the value of the
7½ acres. Fifty-five acres of the farm were to go to Mrs.
Howe. Complainant and her husband agreed to move to
the Crawley farm. They paid rent for it.

Complainant testified, but her testimony was objected to,
and it is not now insisted by her counsel that she was a
competent witness.

After defendant had taken testimony before the master,
complainant offered further testimony as to the value of
the farm and of statements made by Thomas Crawley; also
as to his health, physical condition and the care and atten-
tion he required.

Mrs. Niles, who conducted a hotel in Tuscola, testified
that Thomas Crawley was cross and disagreeable. He oc-
casionally stopped at her hotel but she was never at the
farm. She would not have the care of him for less than
$100 per month.

Emma McCoy, a nurse, testified she had nursed Thomas
Crawley before his wife died and had frequently been at his
house before his son, Frank, died. He was a good man
but selfish and cross. Witness would not take care of him
for less than $25 or $30 a week. About six years before
Frank died, witness asked Crawley why he did not fix his
place up. He said he did not expect to live very long, and
when he died there would be plenty for Frank to fix up the
place and for Minnie to build a little home on her place.

Dr. Reat testified he had known Thomas Crawley forty
or fifty years. He was ill one time after his return from
the State Fair, in 1917, and witness attended him in Tus-
cola. He was afterwards taken out to his farm and wit-
ness attended him there. He told witness a year or more
before that illness that he intended to divide his farm be-

tween his children.   During the doctor's visits to him during the illness referred to, he reminded the doctor of that conversation and said he had divided the farm and given Frank the home place; that he did not intend to change it, as he expected to make his home there.   He said J. M. Merica prepared the papers.

J. M. Merica, a lawyer, testified he prepared a will for Thomas Crawley in 1915, and a deed, he believed, in 1916. There were two deeds,—one to Frank and one to his sister.   He thought the deed to Frank was for the home 40. He did not know what became of the deeds.

S. C. Scheideman testified he lived near Thomas Crawley and had a conversation with him a short time before his son and wife moved back to the farm.   Crawley said the place was not like home to him and he was to see Frank and his wife and ask them to come back to the farm.   In a subsequent conversation he said he had deeded them half the farm and hoped they would stay there, and he would like to see Frank pitch in and buy the other half from Mrs. Howe.   He said he had deeded Frank and wife the part where the improvements were and would make up the difference to Mrs. Howe in money.

Elizabeth Hurst testified she was a sister of complainant and knew Thomas Crawley the last two years of his life.   She visited his son and wife at the farm frequently. Crawley was childish.  If Frank and wife wanted any painting, papering or fixing up done he would tell them the place was theirs and they could fix it up to suit themselves.   Witness would not board and keep him for less than $30 or $35 per week.

The defendant introduced in evidence checks drawn by Thomas Crawley during the time complainant and her husband resided on the farm.   One was to the F. H. Jones Lumber Company for lumber, amounting to about $250; also checks given the complainant by Crawley aggregating $174.15, and a check from Belle Crawley to Thomas Craw-

ley, April 23, 1918, for $62; also a lease to Harry Smith of the farm, made by Thomas Crawley, dated October 15, 1917, leasing the premises from March 1, 1918, to March 1, 1919, for the consideration of $950. Harry Smith moved on the farm pursuant to the lease, and his sister, the complainant, remained with him there. Crawley remained on the farm and occupied the same furniture and room until the corn was gathered, when he went south. Defendant also introduced in evidence a letter written by Frank Crawley to his sister, Mrs. Howe, February 8, 1916, in which he stated that a Mr. Hilgenberg was going to rent his farm and wanted him to take it. He asked what his sister and her husband thought about it. He said if he rented it he would expect to farm the home place, and if he moved to the Hilgenberg place he would get some young married man to work for him and live at the home place. He requested that nothing be said to his father about it, and said he would be farming before his father got back and he could not help himself that year. He complained of the condition of the house and barn on the home place. He repeatedly asked that nothing be said to his father concerning the matter, "for I am not expecting much when he is done with it anyhow. 'Nough said."

John Crawley, nephew of Thomas Crawley, testified he lived in Indiana. In June, 1916, Frank visited him and they had a conversation about Thomas Crawley's land. Witness lived with his mother on land she had a life estate in. He told Frank he did not feel like fixing up the place, and Frank said it was the same way with him,—that he did not feel like fixing up his father's place as he did not know that he would ever get it. He said nothing about any arrangement with his father about his staying on the farm.

Sarah Blake, cousin of Frank Crawley, testified she had a talk with complainant at the farm shortly after the funeral of Thomas Crawley. She said if Frank had lived they would not be living on the home place; that they in-

tended to buy a farm in Indiana and live there. Complainant said she did not then know what she would do; that she would probably move to Tuscola and take rooms.

Mrs. Loman, niece of Thomas Crawley, testified she lived in Iowa; that she attended his funeral and remained about four weeks, visiting around; that she visited complainant and talked with her about Crawley and his dealings; that complainant asked witness if she thought Crawley left a will; that she said he had paid his board and she had planned to use the board money and money she received for butter for Frank and herself to spend a winter in Florida. She said Crawley paid $4 a week board and let them have the pasture rent for $3 an acre.

Henry Rahn testified he lived just across the road from the complainant and her husband when they lived on the Thomas Crawley farm; that in 1916 Frank said he was going to leave the farm; that in the spring of 1917 he said that was his last year there; that he was going to Indiana.

Charles Howe, brother-in-law of Mrs. Howe, testified that in January, 1917, he was selling automobiles in Tuscola; that he had a conversation with Frank Crawley about buying a car; that Frank said he had no place to keep one; that he would not build a place because the farm was not his. Witness told him it probably would be, and he said he had no assurance of that.

It was stipulated by counsel that Amelia Rahn, who was sick, would, if present, testify that she lived just across the road from Frank Crawley from March, 1913, until after his death; that at her house, a short time before Frank's death, complainant said they were not going to stay another year on Crawley's farm; that he charged them $4 per acre privilege rent and was boarding it out, and that she did not think that was fair.

Upon the question of the physical condition of Thomas Crawley and his ability to take care of himself, Dr. Reat testified he had been his physician for something like forty

years; that he spent his winters in the South; that he had hardening of the arteries and vertigo; that he was able to be about and come to town and transact ordinary business, but in the doctor's opinion he ran a risk every time he went up or down stairs; that he was a kind man in disposition, quiet and orderly.

J. R. Cantrall lived in Tuscola and had known Thomas Crawley twenty-five years. Crawley occasionally visited the witness in his office and he saw him in the South in 1907. Witness thought him in good health for one of his age from 1913 to 1918. He was able to get around and take care of himself very well. He was genial and kind.

Charles Jackson lived a half a mile from the Crawley home and saw Crawley nearly every day. He was about the farm most all of the time, working a good deal, fixing it up, setting fence posts, husking and hauling corn. He was not quarrelsome and always seemed pleasant.

Henry Rahn testified to seeing Thomas Crawley working on the farm, fixing fences and hauling corn. He considered him a kind, pleasant man and never heard anyone say the contrary.

A number of other acquaintances of Thomas Crawley testified he always seemed kind and pleasant, and several of them testified that it was worth from $4 to $5 per week to board him.

The foregoing, we believe, is the substance of the most material testimony on the question of the alleged contract and its performance. We have attempted to set it out pretty fully, which renders it unnecessary to comment upon it at length.

The law governing the questions here raised is well settled. The question to be determined is whether a contract and its performance by the promisees in this case is sufficiently proved to warrant decreeing specific performance. It may be conceded the testimony shows Thomas Crawley intended his son, Frank, and his wife, to have the home 40

at his death and that he intended them to have in money one-half the value of the 15-acre tract, which tract and the north 40 acres were to go to Mrs. Howe, but in our opinion the proof of what was said and done is not sufficient to authorize giving effect to that intention after his death. At one time he appears to have had deeds prepared dividing the farm between his two children, but what became of them is not shown by the proof. They were not delivered and were not found among his papers or in the possession of a depositary after his death. While complainant and her husband lived on the farm they paid the customary rent and Crawley paid the taxes. Not a great amount was spent for improvements on the farm during that time, but what was spent for that purpose was paid by Crawley. Most of the time, when not in Florida, he lived and boarded with his son and complainant. It was shown that he paid some money for his board, but how much he paid is not disclosed by the evidence. Some witnesses testified he was cross and disagreeable and that it was worth $25 or $30 per week to board and care for him, while others testified he was kindly dispositioned and agreeable and that board was worth $4 or $5 per week. The evidence does not show that complainant and her husband did anything in reliance upon the contract that would make it a fraud on them if it was not enforced or that they could not be adequately compensated unless it was enforced. Considering all the proof on the question of making the contract, what was done by the promisees in reliance upon it, the testimony of witnesses as to statements made by Crawley about what he intended to do with the farm, the letter written by Frank to his sister and statements made by him and his wife about leaving the farm, it cannot be said the evidence was so clear, definite and satisfactory as to warrant the decree. It may be that what Crawley said led complainant and her husband to expect they would get the home 40 and half the value in money of the 15-acre tract when he died, but something more than

that is required to authorize enforcing the specific performance of an oral contract. The contract must be so clearly and satisfactorily proved as to leave no room for reasonable doubt and acts of performance proved sufficient in equity to take the case out of the operation of the Statute of Frauds. The court said in *Barrett* v. *Geisinger,* 148 Ill. 98: "The basis upon which the doctrine of partial performance rests is, that when a verbal contract has been made and one party has knowingly aided or permitted the other to go on and do acts in part performance of the agreement, in full reliance upon such agreement as a valid and binding contract, and which would not have been done without the agreement, and are of such nature as to change the relations of the parties and to prevent a restoration to their former condition or an adequate compensation for the loss by a judgment at law for damages, then it would be a virtual fraud in the first party to interpose the Statute of Frauds as a bar to the completion of the contract and thus secure for himself all the benefits of the acts already done in part performance, while the other party would not only lose all advantage from the bargain but would be left without adequate remedy for its failure or compensation for what he had done in pursuance of it. To prevent the success of such a palpable fraud, equity interposes under these circumstances and compels the entire completion of the contract by decreeing its specific execution." In *Weir* v. *Weir,* 287 Ill. 495, the court quoted from Story's Equity Jurisprudence: "Nothing is to be considered as a part performance which does not put a party in a situation which is a fraud upon him unless the agreement be fully performed."

We regard the proof in this record as wholly insufficient to sustain the decree, and it is therefore reversed.

*Decree reversed.*