(No. 34242.—

John E. Manias *et al.*, Appellants, *vs.* John F. Yeck *et al.*, Appellees.

*Opinion filed May 23, 1957—Rehearing denied September 16, 1957.*

Cassidy & Cassidy, of Peoria, for appellants.

Mathis & Littler, of Peoria, for appellees.

Mr. Justice Hershey delivered the opinion of the court:

This is an appeal from the circuit court of Peoria County, which dismissed the plaintiffs' suit for specific performance.

The plaintiffs, Mr. and Mrs. John E. Manias, and the defendants, Mr. and Mrs. John F. Yeck, own adjoining property in Peoria. The plaintiffs contend that in June of 1950 they contracted orally with the defendants, promising to convey to them a strip of land 6 feet by 110 feet and pay $100 in exchange for a 10-foot by 37-foot strip. Alleging part performance, they asked specific performance and other relief. The defendants resisted the suit, denying the existence of any such contract. A hearing was held before a master who found for the defendants. The circuit court approved the master's findings, and this appeal followed.

The principal issue is over the existence of the contract. If this be decided in the affirmative there are additional questions to be considered.

The defendants' property is 37 feet, north and south, by 110 feet, east and west. The plaintiffs' land (300 feet by 150 feet) adjoins it on the south and west. Near the west end of defendants' tract is a garage, the west wall being about 12½ feet east of the property line. The plaintiffs have a garage located just to the west of this. Prior to construction hereafter mentioned, this garage was situated on the plaintiffs' property up next to the lot line, leaving about 12½ feet between the two structures. The defendants' garage was for their own personal use; the plaintiffs' garage serviced tenants residing in apartment houses located on their property.

In 1941, John Manias and John Yeck made an oral agreement regarding the use of a 10-foot by 37-foot strip lying between the garages. It was agreed that the plaintiffs could use this strip in return for permission to the defendants to use a strip of land 5 feet by 110 feet which

lay adjacent to the south edge of the defendants' property. They reduced this agreement to writing in 1946 by a paper entitled "Rental Agreement." Stipulated rent was $1 per year, and either party could cancel by giving 30 days' notice. Pursuant to this agreement, the plaintiffs paved the 10-foot by 37-foot strip, and the defendants planted trees, etc., on the 5-foot by 110-foot strip.

There is a dispute as to some of the events which occurred in 1950. John Manias testified that in June of 1950 he had a conversation with John Yeck at which Charles Parker (Manias's son-in-law) was present. He told Yeck that if he (Manias) had 7½ feet or probably 8 feet more ground he would be able to have a five-stall garage. Accordingly, he proposed to Yeck that he would deed him a strip 6 feet by 110 feet (located along the south line of Yeck's property and already used by him) and pay him $100 in exchange for 10 feet off the west end of Yeck's property (*i.e.*, a strip ten feet by 37 feet). He said Yeck readily agreed to this, saying he had no use for that property anyway. Mention was also made of a 5-foot passageway that would remain between the two garages, and it was agreed that each party was to have an easement in that strip. Charles Parker corroborated the plaintiff on this. However, John Yeck denied that he made any agreement to this effect. John Yeck, Jr., his son, testified that he was present at a conversation between Manias and his father during the summer of 1950 at which Yeck protested to Manias about the latter building his garage over the line. According to this witness, Manias said he would tear it down anytime Yeck wanted him to and then offered to buy the land. But Yeck refused to sell.

It is uncontradicted that Parker began work on the garage in June, 1950, and by working afternoons was able to complete it by September. And during that time, Yeck himself testified he never made any protest. Parker said Yeck was out to see him almost daily, and sometimes would

offer a suggestion on the work. As constructed, the building extended 7½ feet across the property line.

Walter W. Winget, a Peoria attorney, testified that Manias contacted him in the summer of 1950 about an exchange-of-real-estate deal he had with Yeck. The witness said he examined the premises in company of both Manias and Yeck and verified the agreement with Yeck. His description of the alleged contract was identical with that related by Manias. While talking with Yeck, he asked to examine the latter's abstract. Yeck obliged, but when Winget asked if he could take the abstract with him, Yeck refused. Winget said that in view of the circumstances it would be well to have a survey made, and afterward he commenced negotiations with Manias's mortgagee regarding the release of the 6-foot by 110-foot strip from the mortgage. Yeck denied he acknowledged the existence of the agreement to attorney Winget. According to him, when Winget came to his house, he (Yeck) did not have the slightest notion what he was there for, nor did Winget explain his mission. Rather, Winget told him he did not have good title and asked to see his abstract. Yeck told Winget to get out, thinking the latter was a "stranger" trying "to steal my abstract." Mrs. Yeck testified that she overheard her husband shout at Winget to leave.

In September of 1950, Robert Herweg, a civil engineer, came upon the premises at the direction of Manias to make a survey and used Yeck's abstract in making it. At one point, he said, Yeck stated with reference to the 6-foot by 110-foot strip that it was the property Manias was giving him. Herweg prepared a plat, introduced as an exhibit in this record, and it shows a lay-out of the properties involved. It bears the date of September 15, 1950, and no objection is made regarding its authenticity. The 6-foot by 110-foot strip is labelled "6.0' x 110.0' Area to be deeded to Yeck." The 10-foot by 37-foot strip is marked "37.0' x 10.0' Area to be deeded to Manias"; and respecting the

5-foot passageway the plat stated "2.5' x 43.0' area on each side of new property line to be given to both Yeck and Manias for a 99-year period as an easement for passage way purposes."

Yeck acknowledged that he talked with Herweg when the latter was making the survey. He admits that he saw the plat a few days after September 15, 1950. "I saw it within a week after. I think the surveyor man showed it to me. We did not have a conversation about it. Maybe he pointed out where the two strips were, I am not sure." But Yeck denied that the survey was made and the plat shown to him in connection with an agreement between him and Manias for the conveyance of those two strips of property. Rather, he said, "I don't know why the plat was shown to me."

In October of 1950, Manias gave Yeck a check for $100, which he said was the money consideration due under the agreement. Yeck admits he cashed the check and used the proceeds, but he denies that it was paid pursuant to any contract. He said the payment was for "good will." His wife said Manias told her it was for "privileges taken and damages."

For the most part the record is silent regarding 1951. Virtually the only testimony bearing on this period is that of attorney Winget, who said he continued his negotiations with Manias's mortgagee regarding a release of the mortgage, and in August of that year prepared warranty deeds designed to effectuate the contemplated transfers. These documents were introduced in this record. It is uncontradicted that during this time Manias's tenants used the entire garage without any objection from Yeck.

However, in April, 1952, Yeck sent Manias a notice purporting to cancel the 1946 rental agreement. He followed this with another notice the following month. The latter provided, in part, as follows: "The One Hundred

Dollars that was paid on October 7th, 1950, is of this date, May 2, 1952, canceled and all other mutual agreements agreed to are terminated, of this date, May 2, 1952." Yeck said he mailed these after becoming provoked at Manias. Manias said these letters were the first indication he had that Yeck was repudiating the 1950 agreement.

Shortly thereafter, Yeck tore down that part of the garage which he said encroached on his land. The plaintiffs then filed the instant suit, asking specific performance of the alleged contract and damages resulting from the tearing down of the garage.

In our opinion, the evidence clearly establishes that John Manias and John Yeck contracted orally during June of 1950 for the exchange of these properties. The plaintiffs make a convincing case, for Manias's testimony regarding the existence of such a contract finds substantial corroboration, including testimony from disinterested parties, and is consistent with and actually confirmed by the subsequent events. Opposed to this, defendants offer the word of John Yeck himself, contradicted in part by his son and weakened by his own letter of May 2, 1952.

Manias and Parker testified that the agreement was made in June of 1950, being prompted by a desire on the part of Manias to extend his garage. Parker began work on the garage right away, and Yeck by his own admission voiced no protest although he was aware that the addition extended over the property line by some 7½ feet. Moreover, Manias contacted a Peoria attorney, Walter Winget, to handle the legal arrangements for him. This attorney testified at length regarding his verifying the agreement with Yeck. A surveyor was contacted, at Winget's urging, to make a plat of the area. This plat, introduced in evidence, shows the designated strips, together with annotations linking them to the said contract. The surveyor, a Peoria civil engineer, showed Yeck this plat, and the latter

raised no question about it. Manias paid Yeck $100, the amount of monetary consideration said to be owing under the agreement. Yeck cashed this check and used the proceeds. All of the foregoing took place in 1950. During 1951, after the garage had been constructed, Yeck still voiced no complaint, and the plaintiffs' tenants continued to use it. And Winget continued negotiations with Manias's mortgagee, a preliminary step in the final closing of the transaction. Finally, when relations were definitely severed between the two parties in April and May of 1952, Yeck's notice actually tends to confirm the existence of the contract. For, as noted, it stated: "The One Hundred Dollars that was paid on October 7th, 1950, is of this date, May 2, 1952, canceled and all other mutual agreements agreed to are terminated, of this date, May 2, 1952." His reference to the cancelling of the $100 payment and the termination of "all other mutual agreements" refutes his statement that this notice was intended solely as a cancellation of the 1946 rental agreement.

It is true, of course, that Yeck categorically denied the existence of any agreement. But there is virtually no corroboration for his denial. Indeed, his only witnesses were his wife and son, and on a significant point his testimony does not jibe with that of his son. The son said he was present at a conversation between Manias and Yeck that took place in the summer of 1950 after the garage had been extended. According to the son, Yeck protested that Manias had encroached on his property. However, Yeck himself said he did not protest anything until over a year and a half later. As Yeck put it: "He had a right to build on there. I didn't protest until he started breaking windows and using profane language * * * I did not care whether the garage was on my strip or not. I never protested."

The conclusion is inescapable that Manias and Yeck did enter into a contract in 1950, and the findings of the

master, so far as they are inconsistent with this conclusion, are manifestly against the weight of the evidence.

Finding a contract to exist, we believe the plaintiffs have demonstrated sufficient part performance to remove the bar of the Statute of Frauds. Possession was taken, the $100 consideration paid, and substantial improvements erected. (Cf. *Gorham* v. *Dodge*, 122 Ill. 528, 533; *McNamara* v. *Garrity*, 106 Ill. 384, 387.) The defendants' argument that possession was not taken under the oral contract, but pursuant to the rental agreement, does not square with the facts.

Also without merit is the defendants' claim that plaintiffs are barred from relief because they failed to tender deeds and a mortgage release before demanding specific performance. The repudiation of the contract waived any requirement of a tender of the deed and mortgage release prior to suit. We stated in *Brubaker* v. *Hatjimanolis*, 404 Ill. 342, at page 347: "It is much more certain that a tender is not necessary if it appears the vendor puts himself in an attitude of default or resists the performance by insisting he is not bound by the contract. An actual tender is unnecessary where it would be a useless act. All the plaintiff need do under such conditions is to place himself in favor with the court by pleading his readiness, willingness and ability to perform on command."

The defendants' next point, however, is well taken: *viz.*, Mrs. Yeck was not a party to a contract with Manias and is not bound by her husband's acts. It is true that there is no proof that Mrs. Yeck became a party to this contract, nor did she ever ratify the agreement. The law is clear that a wife cannot be required to join in a conveyance when she is not a party to the agreement to convey. (See, *e.g.*, *Mix* v. *Baldwin*, 156 Ill. 313; *Clark* v. *Jankowski*, 255 Ill. 129.) Therefore, her undivided one-half interest in the property is not subject to the plaintiffs' action.

The defendants' final contention is that this property was held in joint tenancy between Mr. and Mrs. Yeck, and since the former died in March, 1954, Mrs. Yeck is sole owner of the property and the contract cannot be enforced against the estate of her husband. But it is settled that where one joint tenant makes an agreement to convey, the joint tenancy is thereby severed and a tenancy in common results so that the agreeing owner's interest is subject to the agreement after his death. (See, *e.g., Naiburg* v. *Hendriksen,* 370 Ill. 502, 505; *Klouda* v. *Pechousek,* 414 Ill. 75, 86.) The plaintiffs may elect, as they have done, to take that interest.

The decree of the circuit court of Peoria County is reversed, and the cause is remanded with directions to enter a decree for specific performance of the oral contract, subject to the statement above regarding the one-half undivided interest of Mrs. Yeck, and to proceed in accordance with the views expressed in this opinion.

*Reversed and remanded, with directions.*