WALTER THOMAS *et al.*, Plaintiffs-Appellees, *v.* KENNETH EUGENE MOORE *et al.*, Defendants-Appellants.

Fifth District   No. 77-33

Opinion filed November 28, 1977.—Rehearing denied January 9, 1978.

JONES, J., dissenting.

Earl S. Hendricks, Jr., of Hendricks and Watt, of Murphysboro, for appellants.

C. Robert Hall, of Carbondale, for appellees.

Mr. JUSTICE GEORGE J. MORAN delivered the opinion of the court:

Plaintiffs Walter Thomas and Mary Thomas filed suit in the circuit court of Jackson County on May 11, 1976, asking the court to grant specific performance of an alleged oral agreement for the conveyance of land entered into between the Thomases and the defendants Kenneth Moore and Wilma Moore. The Moores denied the oral agreement and asserted the affirmative defense of the Statute of Frauds. They counterclaimed for possession and damages resulting from the Thomases unlawful withholding of possession of the land which is the subject of this dispute. The circuit court entered judgment granting specific performance of the alleged oral agreement, from which order the Moores appeal.

The appellants present two issues for review; (1) Was there an oral agreement between the parties for the sale of real estate when the Thomases entered into possession of the land? (2) Was there sufficient part performance to remove the alleged oral contract from the Statute of Frauds (Ill. Rev. Stat. 1975, ch. 59, par. 2)?

Walter Thomas testified that he and Kenneth Moore had gone into business together hauling gravel in April of 1975. He said that he had asked Moore a number of times to sell him some land on which he could put a trailer and live with his family. Moore told him that he did not have any land at the present time that he wanted to sell. However, Thomas said that when he offered to trade all of his radio equipment for a piece of property Moore agreed. He said that Moore took him to look at the piece

of property on which the Thomases are presently living, and agreed to trade that piece of property for the radio equipment which Thomas alleged was worth approximately $850.

Thomas and Moore picked the radio equipment up from Thomas's ex-wife's house and took it to Moore's home. When they took the equipment to Moore's house, Thomas asked Moore's wife, Wilma, if it was all right for Moore to trade the property for the radio equipment. She replied that it was Moore's ground, that he could do what he wanted with it and if they traded, she would sign a deed at any time they were ready. The radio equipment was hooked up and the Moores used it until April of 1976.

The tract of land in question is the back corner of Moore's property, enclosed by a fence, with railroad tracks running behind it. Thomas testified that Moore told him he could have an acre in the corner of the property by an old well. Thomas said there was a fence around the area which had to be cut to bring the trailer into the area. Mary Thomas also testified that the area was enclosed by a fence which had been there since they moved onto the property. Walter Thomas said that Moore ran a single strand of wire across the opening to prevent his cattle from getting out and Thomas later added more wire.

Thomas testified that Moore told him it would cost approximately $400 to $450 to get the deed and that at the time he did not have that amount of money.

Prior to moving onto the property, Thomas had power lines put in. He obtained a right-of-way easement from Moore, a copy of which appears in the record, signed by both Moore and Thomas.

The Thomases' trailer was then set up on blocks and underpinned. Walter Thomas cleaned out the old well on the property and Moore helped him on the last day they worked on it. Thomas cleared the area of brush and built a pole barn for his wife's horse. He hauled rock in for a driveway. Mary Thomas testified that no septic system was installed because they could not have one installed until they had a deed to the property.

Mary Thomas said she talked to Moore on the phone on November 17, 1975, and told him that they were getting the money for the deed. Moore said not to worry, that any time they wanted the deed would be fine. Walter Thomas testified that in April of 1976 he told Moore to ask his wife when she would sign the deed and the next day Moore told him that she refused to sign.

Walter Thomas said that after Moore refused him the deed in April of 1976 their business relationship ended. Soon after this the Thomases received a demand of possession from the Moores.

Kenneth Moore testified that Thomas had continually approached him

about buying land, but denied that he ever agreed to trade any of his land for Thomas's radio equipment. He said that he and Thomas never had a conversation about the cost of getting a deed, but that he told Thomas that if he sold him an acre of land, it would cost more than the land was worth, so he was not interested in talking about it. He testified that he told Thomas he did not want to sell any land but if Thomas could not find any land to buy, he could move his trailer onto a piece of his land which had an old well and some shade trees. About two weeks later Thomas moved onto the land and Moore helped him pull the trailer onto it.

Moore admitted that he had Thomas's radio equipment but that it was in a box and not being used. He and Thomas brought it to his house because Thomas's ex-wife wanted it removed from her home. Thomas set it up and wanted them to use it. Moore said that the equipment was worth approximately $350.

Moore testified that he did not construct the fence until several months after the Thomases moved onto the land, when his cattle were getting out through an open gate. Moore recognized the signature on the easement as his but did not remember signing it.

Moore said that his business with Thomas ended in the fall of 1975 when Thomas told him that he was quitting. He said he and his wife asked the Thomases to leave in April of 1976 because the Thomases were slandering them.

Wilma Moore denied ever having a conversation with Thomas concerning the transfer of land. She said the only conversation concerning a deed occurred when Thomas demanded one in April of 1976 when she said she would not sign any kind of deed. She testified that when Thomas brought the radio to her home she told him she did not want it, but he hooked it up anyway. She said they used it until April of 1976 when they gave the Thomases notice of demand of possession because the Thomases were saying things about the Moores.

Dotty Lipe, a woman who sews for Wilma Moore, testified that she had a conversation with Mrs. Moore concerning the radio Mrs. Moore was using. Mrs. Moore told her she and her husband had gotten the radio for nothing—that they had traded an acre of useless ground they did not need for it. Wilma Moore testified that the only thing she had told Lipe was that they were using Thomas's radio.

Ralph Jedamsky testified that he was helping Thomas clean out the old well at the same time Moore and his son, Warren, were helping. He said Moore remarked that the property could be cleaned up if a man took his time, but it was worthless when he swapped it. However, Moore did not say with whom he swapped. Jedamsky also said that when he was on the property, there was a fence around the back of the trailer, up to the road coming from Moore's property down to the main fence that came across

the back of his property, and there was an opening where the fence came from the direction of the railroad crossing. He said that the main fence was three strands of wire, but the fence behind the trailer was one strand of wire.

Kenneth Warren Moore, defendants' son, testified that he helped his father and Ralph Jedamsky clean the well and would have heard any conversation between his father and Jedamsky. He did not hear the conversation testified to by Jedamsky.

■■ The Moores contend that there was not an oral contract between the parties for the sale of the real estate in question. They argue that the description of the real estate was insufficient to entitle the Thomases to specific performance of the alleged contract. A contract for the sale of land must definitely point out the land to be conveyed or furnish the means of identifying the land with certainty. (*Kopprasch v. Satter*, 331 Ill. 126, 62 N.E. 141.) A description of land is sufficiently definite to justify specific performance when it will enable a surveyor, by the aid of extrinsic evidence, to locate the property. *Classen v. Ripley*, 343 Ill. App. 298, 98 N.E.2d 868; *Welsh v. Jakstas*, 401 Ill. 288.

The trial court ordered the Moores to convey to the Thomases the areas inside the wire fence. The Moores argue that the trial court made the contract for the parties by finding that the fence adequately described the property to be conveyed. They argue that the evidence did not show that the fence was in existence at the time of the alleged oral agreement and therefore could not be used in the description of the land. However, there was testimony by the Thomases that there was a fence around the property and that it was cut to allow the Thomases to move their trailer into the area. Moore testified that he did not construct a fence until several months after the Thomases had moved into the land, and then only because his cattle were getting out through an open gate.

■■ Where the testimony is contradictory, the trial court is in a position superior to this court to observe the conduct of the witnesses while testifying, to determine their credibility, and to weigh the evidence and determine the preponderance thereof. Therefore, unless the holding of the trial court is against the manifest weight of the evidence, this court will not substitute its own opinion. (*Schulenburg v. Signatrol, Inc.*, 37 Ill. 2d 352, 226 N.E.2d 624.) There being evidence adequate to show that the fence was in existence at the time of the agreement, the trial court's holding shall not be disturbed.

■■■ The Moores' second contention is that there was not sufficient performance of the oral contract by the Thomases to remove the contract from the Statute of Frauds (Ill. Rev. Stat. 1975, ch. 59, par. 2). They cite cases holding that an oral contract for the sale of real estate may be taken out of the Statute of Frauds by the payment of the purchase money, being

let into possession, and the making of lasting and valuable improvements. (*Wright v. Raftree,* 181 Ill. 464; *Black v. Hoopeston Gas & Electric Co.,* 250 Ill. 68; *Clark v. Clark,* 122 Ill. 388; *Flannery v. Woolverton,* 329 Ill. 424; *McCallister v. McCallister,* 342 Ill. 231.) The Moores argue that the improvements added by the Thomases were not valuable improvements as the courts have interpreted that term. However, it has not been consistently held that the vendee must have made improvements on the land to take the oral contract out of the Statute of Frauds. More recently it has been held that where the consideration is fully paid and possession given the purchaser, there is sufficient performance to take the agreement out of the Statute of Frauds. (*David v. Schiltz,* 415 Ill. 545.) Thus, although improvements are a factor to be considered, they are not necessary to show the performance necessary to take an oral agreement out of the Statute of Frauds. The radio equipment having been given by the Thomases as consideration, and the Thomases having taken possession of the land, there was sufficient performance to remove the oral contract from the Statute of Frauds.

For the foregoing reasons the judgment of the circuit court of Jackson County is affirmed.

Affirmed.

CARTER, P. J., concurs.

Mr. JUSTICE JONES, dissenting:

I respectfully dissent.

Examination of the entire record in this case, both common law and transcript, compels the conclusion that there never was a contract or agreement for the sale of real estate because the requisite of a particular parcel of property which could be the subject of an agreement was lacking. The firmly established rule is that to warrant specific performance of a contract to convey land the contract must definitely point out the land to be conveyed or furnish means of identifying it with certainty. *Hogan v. Orr,* 341 Ill. 58, 173 N.E. 162; *Heroux v. Romanowski,* 366 Ill. 297, 168 N.E. 305; *Kopprasch v. Satter,* 331 Ill. 126, 162 N.E. 141; *Crocker v. Smith,* 366 Ill. 535, 9 N.E.2d 309.

The asserted oral contract in the case at hand is plainly lacking in any definite description or in any indicia that would lead to *the* tract, or *a* tract, or, indeed, to *any* tract. The trial court and the majority here have simply furnished a description for the parties *after* the fact of occupation of *some* land by the plaintiffs.

At the time the asserted oral contract was made the description was insufficient. One acre out of 40 acres is extremely indefinite. There are 40 square one-acre tracts in 40 acres but when you consider the possibility of

the number of irregular one-acre tracts that could be described in a 40-acre field, the possibilities are almost without limit.

The total lack of any description of the land intended was heralded by the "description" contained in plaintiffs' complaint:

"One acre, more or less, situated in the Southwest Quarter of the Southwest Quarter of Section 27, Township 9 South, Range 2 West of the Third Principal Meridian, in the County of Jackson and State of Illinois."

That which was foretold was fulfilled. After the trial and the decree, there is still no description. The decree ordered conveyance to plaintiffs of:

"[T]he subject premises inside the retaining wire as identified by the evidence after the plaintiffs have procured a survey of the subject premises * * *."

The best description plaintiffs were able to furnish was in the testimony of plaintiff Walter Thomas:

"Q. Now, describe this property as best you can in which you are now in possession and have been since June of 1975?

A. Well, I don't know how to describe it. It's on the back corner of his property right after you cross the railroad tracks down from Mack Ashman's farm. You turn to the left as you cross the tracks, and we have a fence all the way around the property that I am living on.

Q. And did you—When did you put that fence on there?

A. He [Moore] put a wire up first and I [Thomas] put a few strands up later after he put one strand up on the property line.

* * *

Q. And this is all within the confines of that fence?

A. Yes."

I believe the error of the majority is compounded by confusion over the fence. With regard to the fences the majority states:

"The tract of land in question is the back corner of Moore's property, enclosed by a fence, with railroad tracks running behind it. Thomas testified that Moore told him he could have an acre in the corner of the property by an old well. Thomas said there was a fence around the area which had to be cut to bring the trailer into the area. Mary Thomas also testified that the area was enclosed by a fence which had been there since they moved onto the property. Walter Thomas said that Moore ran a single strand of wire across the opening to prevent his cattle from getting out and Thomas later added more wire."

It thus appears that the majority found only one fence involved and that defendant "ran a single strand of wire across the opening to prevent his

cattle from getting out." But there was no such testimony by plaintiff Walter Thomas.

The evidence conclusively shows that two fences were involved. One enclosed the 40-acre tract owned by defendants prior to any of the events that transpired in this case, no matter whose version of the facts is believed. It was this fence that plaintiffs cut to gain entry to the 40. After plaintiffs had established themselves upon the 40 the defendants erected a single strand wire fence around plaintiffs' zone of occupation and to the cut in the original fence in order to prevent their (the defendants') cattle from escaping from the original cut in the "forty acre" fence. Plaintiffs later added two additional strands of wire to this second fence for purposes of their own.

The testimony which describes the two fences involved was as follows, all from plaintiff Walter Thomas:

"Q. Was there a fence that you had to cut to get into this place where the well was located?

A. There sure was.

Q. And was this fence left open?

A. Yes, sir. It was.

Q. And did his cattle get out?

A. They're still getting out.

* * *

A. * * * You turn to the left as you cross the tracks, and we have a fence all the way around the property that I am living on.

Q. And did you—When did you put that fence there?

A. He put a wire up first and I put a few strands up later after he put one strand up on the property line.

* * *

Q. And when Mr. Moore strung this wire, it was to keep his cattle in, was it not?

A. If it was, he didn't put up enough fence because he left an opening for them to walk right on through between the barn and the corral where I had my horse."

The parties give opposing stories as to the reason why the Thomases gave the radio to Moore and moved their trailer onto the property. Thomas claims it was pursuant to a contract for deed, Moore insists that the radio is and always has been the property of Thomas, that Thomas wanted to get the radio from the home of his ex-wife and had no place to put it so left it with Moore and insisted that he have the use of it. If Thomas is forced to move off the property, or, according to Moore's story, even if Thomas does not move off the property, then the radio still belongs to Thomas. It is true that Moore has had the use of the radio for over a year but it is likewise true that Moore has had a place to park his trailer for about 2½ years. Were their trailer parked elsewhere than on the

Moore property, the Thomases would be out of pocket the monthly rent on a trailer site.

It is certainly true that plaintiffs made substantial improvements in the occupied zone and that they are in possession thereof. However, such possession and improvements do not justify the courts in writing a contract for a deed where none was in existence in the first instance. It is obvious that there are equities to be adjusted between these parties and I would have that done after an appropriate hearing rather than compel conveyance of a tract of land whose description is yet to be determined. By such procedure equity would not be disserved nor justice denied, and the integrity of the law of conveyancing would remain intact.