In the

# United States Court of Appeals

## For the Seventh Circuit

No. 07-3744

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

CAPITAL TAX CORPORATION,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 04 C 4138—**George M. Marovich**, *Judge*.

ARGUED MAY 5, 2008—DECIDED SEPTEMBER 19, 2008

Before CUDAHY, POSNER and ROVNER, *Circuit Judges*.

CUDAHY, *Circuit Judge*.  Capital Tax Corporation (Capital Tax) is an Illinois company that purchases distressed real estate properties and resells them for profit. At a Cook County scavenger sale in October 2001, Capital Tax successfully bid on tax certificates to a derelict paint factory on the south side of Chicago. Capital Tax claims that it then entered into an agreement to sell the property to a man named Mervyn Dukatt. Pursuant to this alleged contract, Capital Tax exercised its option on the

tax deed and delivered possession of the property to Dukatt. Capital Tax retained legal title to the property, however, as security for the remainder of the purchase price. Dukatt never made another payment, leaving Capital Tax with title to an unwanted property.

Both the Chicago Department of the Environment (CDOE) and the Environmental Protection Agency (EPA) were called to the old paint factory after receiving complaints that toxic paint products were leaking out of the factory into nearby streets and sewers. The inspections revealed thousands of rusty and leaking barrels containing hazardous waste. The EPA ordered Capital Tax to dispose of the waste but Capital Tax refused; the EPA cleaned up the site itself. The Government then brought this suit under Section 107(a) of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA) for the response costs it incurred. *See* 42 U.S.C. § 9607(a). The district court granted summary judgment in favor of the Government on both liability and damages. Capital Tax now appeals, raising two basic arguments. First, it claims that it is not liable under CERCLA because it is not the "owner" of the facility. Second, even if it is liable, Capital Tax claims that it is only responsible for the cleanup of the parcels it owned.

## I.

The hazardous waste site facility at issue in the present case is an old paint manufacturing facility located at 7411-7431 South Green Street in Chicago, Illinois. For many years, this facility was operated by the National Lacquer and Paint Company, Inc., which produced paint products

and stored the chemicals and materials used to produce them. This facility, which we call the "National Lacquer site," consists of four two-story buildings, two one-story buildings and two yards; it is situated on one acre of land in a mixed industrial, commercial and residential area of Chicago. Although the site is now divided into seven parcels (Parcels 5, 26, 8, 9, 10, 11 and 12), it was historically operated as a single plant.[1] When viewed on a map, the seven rectangular parcels are stacked neatly on top of one another. Each parcel is connected to the others by a fire door or passageway, and several of the parcels share common yards.

In December 1995, William Lerch and Steven Pedi, through their newly created company, National Lacquer Company (National Lacquer), purchased the assets of the old National Lacquer and Paint Company. From 1995 to 2002, National Lacquer reclaimed paint, manufactured paints and coatings, and performed furniture stripping operations at the site. The company used a number of different hazardous materials, which were stored all over the site.[2] It is undisputed that hazardous materials leaked

---

[1] Parcel 5 contained the warehouse; Parcel 26 contained the main office and the warehouse yard; Parcel 8 contained the main mixing room; Parcel 9 contained the roller mill room and part of the storage yard; Parcel 10 contained the pigment room and part of the storage yard; Parcel 11 contained the wash department and part of the storage yard; and Parcel 12 contained the bar mill room.

[2] The chemicals included the following substances: ethyl acetate, xylene, methylene chloride, methyl ethyl ketone, methyl
(continued...)

or were spilled onto the ground throughout this period. In January 1998, for example, the CDOE inspected the site and found "hundreds of rusty, damaged and leaking pails, cans and jars." Not only were these paint products spilling onto the floor, rainwater from a leaky roof mixed with the paint and flowed across the floor into drains and sewers and eventually into the street.

By 2001, National Lacquer had fallen behind on its property taxes, and Cook County made five of the seven parcels available for sale (Pedi retained title to Parcels 8 and 10). At tax scavenger sales, potential buyers bid on the delinquent taxes, and the winning bidder receives a tax certificate for the property. If the original owner fails to redeem the delinquent taxes within a statutory period, the tax sale bidder then has the right to petition for a tax deed to the property. Tax certificates do not pass title; they are similar to an option to later obtain title if the certificate holder chooses to exercise that option. Representatives of Capital Tax visited the National Lacquer site before the scavenger sale and conducted a limited inspection. While they were not able to enter the property, it was apparent to them that the property was a former paint factory. Capital Tax then successfully bid on the tax certificates.

After purchasing the tax certificates but before obtaining the tax deeds, Capital Tax claims that it struck a

---

[2] (...continued)
isobutyl ketone and phosphoric acid. All of these substances are listed as "hazardous substances" under CERCLA. *See* 40 C.F.R. § 302.4 (2002).

deal with Dukatt in which Capital Tax agreed to obtain the tax deeds to the property and to convey them to Dukatt in exchange for about $25,000. No written agreement was ever made. Because Capital Tax did not typically obtain the tax deeds until they had a buyer, Dukatt gave Capital Tax a $15,000 check ostensibly as partial payment for the property. On October 30, 2001, Capital Tax obtained tax deeds for four of the parcels. On February 14, 2002, it obtained a tax deed for the fifth parcel. Capital Tax also obtained an order of eviction to secure possession of the site from its previous owner, Lerch.[3] After that, Capital Tax had very little to do with the property.

Dukatt, however, was frequently at the site. He had the keys to the property and the office. Capital Tax deferred to him on all matters regarding the site. Dukatt hired workers who, over the course of two or three weeks, cut up and removed the paint machines that had been in the garage. They also prepared and replaced an overhead door and knocked down two walls. This work allegedly cost Dukatt $10,000. In April 2002, the CDOE responded to a call concerning a spill of hazardous materials at the site. It discovered that paint containers had recently been moved from parcel to parcel; trails of spilled product traced the movement of these substances. It is unclear whether it was Dukatt, Lerch or perhaps a third party who moved the containers. The CDOE, however, noted that Capital Tax had made little effort to secure the site

---

[3]  Dukatt met the sheriff's department when it arrived to carry out the eviction and represented himself to be an "agent" of Capital Tax.

and it issued Capital Tax a notice of violation for "allowing a spill of hazardous substances due to container movement at the Site." On July 23, 2003, the CDOE officially requested that Capital Tax clean up the site. Capital Tax refused. It later explained that it "didn't care" about the site because it considered it to be Dukatt's problem.

The CDOE referred the matter to the EPA. On July 31, 2003, the EPA conducted its own inspection of the site. The EPA found more than 10,000 containers of various sizes, including gallon drums, storage tanks, cylindrical mixing tanks, vats, buckets, compressed gas cylinders, laboratory jars and bottles—most of which contained hazardous substances. Many of the containers were unsealed, leaking or otherwise deteriorating. The EPA also found evidence of trespassing on the site. On August 15, 2003, the EPA issued a Unilateral Administrative Order (UAO) demanding that Capital Tax clean its five parcels. Capital Tax did not comply. So, on October 6, 2003, the EPA removed the hazardous materials itself. The EPA also cleaned manholes and pits, excavated the top foot of storage yard soil, backfilled and planted the storage yard with grass. It sealed the tanks and pressure washed interior floors and walls to remove potential contamination.

The Government then filed suit against Capital Tax, Pedi and Lerch under CERCLA to recover the costs of the cleanup. The Government also sought civil penalties, *see* 42 U.S.C § 9606(b), and punitive damages, *see* 42 U.S.C. § 9607(c)(3), against Capital Tax for failing to comply with the UAOs. Capital Tax denied that it was liable under CERCLA, raising the "security interest" exemption under 42 U.S.C. § 9601(20)(A) and an "innocent landowner"

defense under 42 U.S.C. § 9607(b)(3). On April 11, 2006, the Government moved for partial summary judgment on liability, which the district court granted. On August 24, 2006, the Government moved for summary judgment on damages, which the district court also granted, finding Capital Tax jointly and severally liable to the Government for $2,681,337.79 in response costs. It also assessed civil penalties in the amount of $230,250.00.

## II.

The first major issue here is Capital Tax's liability under § 107(a) of CERCLA for the response costs incurred by the Government in the cleanup of the National Lacquer site. Under 42 U.S.C. § 9606(a), the Government may order potentially responsible parties to clean up hazardous waste sites. Further, under 42 U.S.C. § 9604(a), the Government is authorized to conduct its own cleanups of hazardous waste sites using the Hazardous Waste Superfund. The Government can then bring an action under § 107(a) to recover damages from potentially responsible parties. *See* 42 U.S.C. § 9607(a). In either case, the "polluter pays." *Cf. United States v. Burlington Northern & Sante Fe Ry. Co.*, 520 F.3d 918, 941 (9th Cir. 2008).

To establish liability under § 107(a), the Government must show that: (1) "the site in question is a 'facility' as defined in § 101(9); the (2) the defendant is a responsible party under § 107(a); (3) a release or a threatened release of a hazardous substance has occurred; and (4) the release or threatened release has caused the plaintiff to incur response costs." *Kerr-McGee Chem. Corp. v. Lefton Iron &*

*Metal Co.*, 14 F.3d 321, 325 (7th Cir. 1994). Capital Tax concedes three of these elements.[4] The only element in issue here is the second element: whether Capital Tax is a responsible party under § 107(a).

CERCLA is strict liability statute. *See Nutrasweet Co. v. X-L Eng'g Co.*, 227 F.3d 776, 784 (7th Cir. 2000). Liability is imposed when a party is found to have a statutorily defined "connection" with the facility; that connection makes the party responsible regardless of causation. *See United States v. Hercules*, 247 F.3d 706, 716 (8th Cir. 2001). Section 107(a) lists four different categories of potentially responsible parties. *See* 42 U.S.C. §§ 9607(a)(1)-(4). The only category in issue here is specified by § 107(a)(1), which makes the current "owner and operator of . . . a facility" liable for cleanup costs. *See* 42 U.S.C. § 9607(a)(1). The Government has not claimed in this court that Capital Tax "operated" the facility in any way. Thus, the Government's argument is that Capital Tax is liable for response costs simply because it is the current "owner" of the facility. 42 U.S.C. § 9607(a)(1).

There is very little we can glean from the statute about the meaning of ownership. CERCLA defines "owner" as

---

[4] Capital Tax concedes that the National Lacquer site is either a "facility" or, in its view, several different "facilities." The "releases" in this case included, among other things, the leaking and evaporation of toxic paint products and chemicals stored in leaky and deteriorating containers. Finally, no one disputes that the EPA incurred over two million dollars in response costs when it cleaned up the National Lacquer site.

"any person owning" a facility. 42 U.S.C. § 9601(20)(A). The circularity in the statutory language suggests that "the statutory terms have their ordinary meanings rather than unusual or technical meanings." *Sidney S. Arst Co. v. Pipefitters Welfare Educ. Fund*, 25 F.3d 417, 419 n.1 (7th Cir. 1994). The generality of the term of the term "owner" also suggests that Congress intended us to turn to "common law analogies." *Edward Hines Lumber Co. v. Vulcan Materials Co.*, 861 F.2d 155, 157 (7th Cir. 1988). Congress did state, however, that the definition of "owner does *not* include a person who, without participating in the management of a . . . facility, holds indicia of ownership primarily to protect his security interest in the vessel or facility." 42 U.S.C. § 9601(20)(A) (emphasis added). A "security interest" is "a right under a mortgage, deed of trust, assignment, judgment lien, pledge, security agreement, factoring agreement, or lease and any other right accruing to a person to secure the repayment of money, the performance of a duty, or any other obligation by a nonaffiliated person." 42 U.S.C. § 9601(20)(G)(vi). This has become known as the "security interest" exclusion, and the party seeking to assert it bears the burden of establishing it. *See Monarch Tile, Inc. v City of Florence*, 212 F.3d 1219, 1222 (11th Cir. 2000).

The Government claims that Capital Tax is the "owner" under § 107(a)(1) because it holds legal title to five of the seven parcels at the National Lacquer site. Capital Tax does not dispute that it has legal title to those parcels and thus holds "indicia of ownership." Capital Tax contends, however, that it sold the parcels to Dukatt. According to Capital Tax, it only holds legal title to the property as

security for the balance of the purchase price under the contract. *See* 42 U.S.C. § 9601(20)(A). The district court rejected this argument. It emphasized that Capital Tax had not taken the title in order to secure a loan. Indeed, as the district court noted, Capital Tax had never loaned money to anyone—not Dukatt, not Pedi and not Lerch. Because Capital Tax was not a "lender," the district court reasoned, its interest in the property was not a security interest.

We agree with the district court that Capital Tax's argument is sometimes confusing. But the basic legal principle underlying Capital Tax's argument—that equitable ownership passed from Capital Tax to Dukatt when the land sale contract was executed—has a long history at common law. "The rule in the vast majority of jurisdictions is that on entering into a contract for the purchase of land, the purchaser is the owner in equity of the land, and the seller holds legal title as security for payment of the purchase price." 17 RICHARD A. LORD, WILLISTON ON CONTRACTS § 50:42 (4th ed. 2000). Echoing this rule, we have held in the bankruptcy context that an installment land sales contract is "merely a security agreement where the vendor holds legal title in trust solely as security for the payment of the purchase price." *In re Streets & Beard Farm Partnership*, 882 F.2d 233, 235 (7th Cir. 1989) (applying Illinois law). Perhaps Capital Tax's constant reference to the "security interest" exception has caused some confusion here, for Capital Tax is not a

typical creditor.[5] Capital Tax's argument would be more easily understood if it simply argued that it is the *former* owner of the facility—not the *current* owner—and thus not liable under § 107(a)(1). This, of course, is a classic "equitable conversion" argument. Although there might be some merit in the district's court's conclusion that Capital Tax is not a "secured creditor," we think the more appropriate methodology under the particular facts presented here is to address the issue under the ownership provision of § 107(a)(1).

The central question here is what role, if any, the doctrine of equitable conversion plays in the definition of ownership under CERCLA. As we have already explained, the statute gives little concrete guidance on the issue. Congress intended courts, in defining § 107(a)(1), to draw analogies to common law, *see Edward Hines*, 861 F.2d at 157, and to the ordinary meaning of the term ownership, *see Sidney S. Arst*, 25 F.3d at 419 n.1. It is notable that two courts of appeals have held that public or quasi-public companies

---

[5] Capital Tax does have a colorable argument regarding the "security interest" exclusion. The exclusion covers more than "typical" lending scenarios: it covers "any . . . right accruing to a person to secure the repayment of money, the performance of a duty, or any other obligation." 42 U.S.C. § 9601(20)(G)(vi). Further, the exclusion explicitly recognizes that a person can hold "indicia of ownership," such as legal title, and yet not be the owner under CERCLA. *Id*. As one court has stated, "under the security interest exception the court must determine why [a party] holds such indicia of ownership." *In re Bergsoe Metal Corp.*, 910 F.2d 668, 671 (9th Cir. 1990).

that hold legal title to property in order to secure the recoupment of development costs are not "owners" under CERCLA. *See Monarch Tile*, 212 F.3d at 1222; *In re Bergsoe*, 910 F.2d at 671. More specifically, a number of district courts have applied the doctrine of equitable conversion in CERCLA cases, both under § 107(a)(1)'s "ownership" provision and under the "security interest" exclusion. *See, e.g., United States v. Union Corp.*, 259 F. Supp. 2d 356, 395 (E.D. Pa. 2003); *K.C. 1986 Ltd. P'ship v. Reade Mfg.*, 33 F. Supp. 2d 820, 834 (W.D. Mo. 1998). *United States v. Webzeb Enters., Inc.*, 809 F. Supp. 646, 652 (S.D. Ind. 1992); *Snediker Devs. Ltd. P'ship v. Evans*, 773 F. Supp. 984, 987-88 (E.D. Mich. 1991). Thus, it is difficult to dismiss Capital Tax's argument out of hand.

So we must determine whether, in applying the doctrine of equitable conversion in the CERCLA context, we should attempt to fashion our own federal rule or look to applicable Illinois law as the federal standard. *See United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 727-28, 99 S. Ct. 1448, 1457-58, 59 L. Ed.2d 711 (1979). There is no need to escalate the scope of the inquiry by attempting to apply a federal common law here; instead, we merely look to state law for guidance in interpreting the statute. Of course, federal law, as a formal matter, ultimately governs the definition of ownership under § 107(a). *Id*. at 726, 99 S. Ct. 1448. But this case presents a particularly strong case for the employment of relevant state law as the proper guide to the federal standard. *Cf. Redwing Carriers, Inc. v. Saraland Apartments*, 94 F.3d 1489 (11th Cir. 1996) (adopting state partnership law as the federal standard to determine ownership under CERCLA).

Property relations have historically been governed by state law. *See, e.g., Butner v. United States*, 440 U.S. 48, 99 S. Ct. 914, 59 L.Ed.2d 136 (1979); *Oregon ex rel. State Land Board v. Corvallis Sand & Gravel Co.*, 429 U.S. 363, 378, 97 S. Ct. 582, 50 L. Ed.2d 550 (1977). When Congress instructed courts to look to the traditional, common-law meaning of ownership in interpreting CERCLA, it was certainly aware of this history. And Congress gave no indication that it intended to take a new course. *Cf. United States v. Bestfoods*, 524 U.S. 51, 62, 118 S. Ct. 1876, 141 L. Ed.2d 43 (1998) ("nothing in CERCLA purports to reject this bedrock principle [of corporate law], and against this venerable common-law backdrop, the congressional silence is audible"). The understanding that state law governs property and the expectations built around that understanding strongly suggest that the federal standard should be rooted in an adoption of state property law. This conclusion is bolstered by the fact that there is no practical alternative to this approach. To invent out of whole cloth a distinctly federal law of property would be inappropriate, if not impossible.[6]

---

[6] We think the reasonable approach is simply to look to state law for guidance in interpreting the statute. This conclusion also follows from *United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 727-28, 99 S. Ct. 1448, 59 L. Ed.2d 711 (1979).

First, we note that state laws are already generally uniform on the point raised here; states are in substantial agreement about the operation of the doctrine of equitable conversion. *See* 17 RICHARD A. LORD, WILLISTON ON CONTRACTS § 50:42 (4th ed. 2000).

(continued...)

The Illinois doctrine of equitable conversion provides that a valid land sale agreement transfers equitable title to the purchaser. *See Shay v. Penrose*, 25 Ill.2d 447, 185 N.E.2d 218, 219-20 (1962). Thus, "when the owner enters into a valid and enforceable contract for the sale of realty, the seller continues to hold legal title, but in trust for the buyer; the buyer becomes the equitable owner and holds the purchase money in trust for the seller." *In re Estate of Martinek*, 140 Ill. App. 3d 621, 488 N.E.2d 1332, 1336 (Ill. Ct. App. 1986). But "[t]he doctrine of equitable conversion does not apply where equitable considerations intervene or where the parties intend otherwise." *Eade v. Brownlee*, 29 Ill.2d 214, 193 N.E.2d 786, 788 (1963). In addition, in order to invoke the doctrine of equitable conversion, the party must show that "a valid and enforce-

---

[6] (...continued)

Second, CERCLA policy would not be undermined by a reference to state law. It is highly unlikely that states would alter core principles of property law or amend their statutes of fraud in order to affect their impact on pollution liability. Changes to the basic principles of property law would potentially have wide-ranging effects that would be difficult to limit. It is unlikely that states would attempt to manipulate these doctrines to affect responsibility for environmental violations.

Third, we believe that deviation from state law here might be inequitable. Citizens naturally look to state law to determine their relative rights and obligations with respect to the issue of property. It would seem unfair for a party who was not an "owner" under state law to face liability under a federal statute based on "ownership."

able contract [has been] entered into." *Shay*, 25 Ill.2d 447, 185 N.E.2d at 220. This presents an obstacle for Capital Tax because, under the Illinois Statute of Frauds, a valid contract for the sale of land must generally be in writing. *See* 740 ILL. COMP. STAT. 80/2 (2004). Capital Tax has no such written agreement; it concedes that the contract was oral.

Illinois courts, however, have also routinely recognized exceptions to the Statute of Frauds. The relevant exception here is part performance. Under Illinois law, a contract is taken outside the Statute of Frauds if the buyer makes whole or partial payment of the purchase price, takes possession of the property *and* makes substantial and lasting improvements to it.[7] *See Manias v. Yeck*, 11 Ill. 2d 512, 144 N.E.2d 596, 600 (1957); *Thomas v. Moore*, 55 Ill. App. 3d 907, 370 N.E.2d 809, 812 (Ill. Ct. App. 1977); *Meyer v. Surkin*, 262 Ill. App. 83, 90 (Ill. App. Ct. 1931). Further, the evidence must be "referable" to the contract—that is, it must actually suggest the existence of a a sales agreement. *McCallister v. McCallister*, 342 Ill. 231, 173 N.E. 745, 748 (1930); *Weir v. Weir*, 287 Ill. 495, 501-02, 122 N.E.

---

[7]  Because Capital Tax—the seller of the property—is seeking to establish the validity and enforceability of the contract, it must also establish that it has partially performed its own obligations under the contract. *See* RESTATEMENT (SECOND) OF CONTRACTS § 129 cmt. e (1979). In fact, Capital Tax has purported to show that it has fully performed: not only did it obtain the tax deeds as promised, it also secured an order placing Dukatt in possession of the property.

868 (1919). If the actions that purport to show part per-
formance are easily explained without reference to a
contract, the Statute of Frauds is not satisfied. Appropriate
parol evidence must leave "no reasonable doubt in the
mind of the court" that a contract has been formed.
*Weir*, 287 Ill. at 502, 122 N.E. 868.

Capital Tax has presented some evidence to support
each element of part performance—partial payment,
possession and valuable improvements. But the probative
value of the evidence is unclear. With respect to partial
payment, Capital Tax asserts that Dukatt gave Capital Tax
a check for $15,000. The check stated that is was for
"taxes," which Capital Tax claims to be a reference to
the "taxes" component of the purchase price. Still, there
is no evidence that the check specifically refers to the
National Lacquer site. Dukatt worked with the principals
of Capital Tax on other deals and with other properties;
the check could easily have referred to some other deal.
Although it may very well display his signature, the
check is actually not from Dukatt; it is from an entity
called "Snowball's Plaza." Given these uncertainties, we
find it perplexing that Capital Tax did not ask Dukatt at
his deposition why he had written the check.

Capital Tax also asserts that Dukatt took possession of
the property and did work on the garage. It is unclear
whether this work would constitute "lasting and valu-
able" improvements under Illinois law. More importantly,
again, we doubt whether this activity was actually "refer-
able" to the contract. Dukatt was loosely affiliated with
Capital Tax—a "friend" of the corporation—and, at times,

he even represented himself to be "agent" of Capital Tax.
Dukatt had frequent conversations with the principals
of Capital Tax about the facility. Perhaps Dukatt, when
he did work on the garage, was working under Capital
Tax's direction. While we do not know the exact nature
of the relationship between the parties, Dukatt's presence
at the site does not necessarily imply that he was acting
*as if* he owned the site.

The district court did not address these issues given
its disposition of the case. From this record, it is difficult
for us to determine whether Capital Tax had a valid and
enforceable contract for the sale of land under Illinois
law. If there is no valid contract, then Capital Tax is the
"owner" under § 107(a)(1) and is liable under CERCLA. If
there is a valid contract and if equitable conversion
applies, Capital Tax is not the "owner" under § 107(a)(1)
and is not liable under CERCLA. The case will likely
turn on whether the facts show that Dukatt was, in fact, a
bona fide buyer. Especially given the substantial liability
in this case and the uncertainty surrounding many of
the issues, it is not for us to resolve them in the first
instance. We must remand to the district court to give
fresh and full consideration to the question whether
Capital Tax had an enforceable land sales contract under
Illinois law and whether the doctrine of equitable con-
version applies in this case.

### III.

We now consider Capital Tax's alternative argument
that it should not be held jointly and severally liable for

all the removal costs and instead be found liable for only a portion of those costs. Unlike the first issue, we can answer the divisibility question on the record before us because there are no substantial disagreements about the facts. Once a party is found to be liable under CERCLA, the party is jointly and severally liable for all of the EPA's response costs, "regardless of that party's relative fault." *Metropolitan Water Reclamation Dist. of Greater Chicago v. North American Galvanizing & Coating, Inc.*, 473 F.3d 824, 827 (7th Cir. 2007). Courts, however, do recognize one judicially created exception to joint and several liability under § 107(a). If a liable party can establish that the harm is divisible—that is, that there is a reasonable means of apportioning the harm among the responsible parties—then that party is not subject to joint and several liability. *See United States v. Township of Brighton*, 153 F.3d 307, 317-18 (6th Cir. 1998).

The concept of divisibility has largely been derived from § 433A of the Restatement (Second) of Torts. *See, e.g., United States v. Alcan Aluminum Corp.* (*Alcan III*), 315 F.3d 179, 186 (2d Cir. 2003); *United States v. Monsanto Co.*, 858 F.2d 160, 171-72 (4th Cir.1988). Some courts have noted that the "fit" between § 433A and CERCLA is actually quite unclear: § 433A focuses on causation while CERCLA is a strict liability statute.[8] *See Burlington Northern*, 520 F.3d at 937-39; *Hercules*, 247 F.3d at 715-16.

---

[8] We reiterate that we follow the Restatement and common law "only to the extent that [they are] compatible with the provisions of CERCLA." *Hercules*, 247 F.3d at 717.

The Restatement does suggest, however, that liability can be apportioned if Capital Tax can show that its portion of the damages is susceptible of a "reasonable estimate." *In re Bell Petroleum Servs.*, 3 F.3d 889, 904 (5th Cir. 1993). Divisibility is the exception, however, not the rule.[9] *Metropolitan Water*, 473 F.3d at 827 n.3. Thus, the burden of establishing divisibility is on the defendant. *See Alcan III*, 315 F.3d at 185.

One method of creating a reasonable estimate of damages is to show that the contamination at the facility is geographically divisible. *See, e.g.*, *Chem-Nuclear Systems, Inc. v. Bush*, 292 F.3d 254, 255 (C.A.D.C. 2002). A landowner can establish divisibility by "demonstrating a reasonable basis for concluding that a certain proportion of the contamination did not originate on the portion of the facility that the landowner owned." *Burlington Northern*, 520 F.3d at 938. Typically, this will involve showing that the "site consists of non-contiguous areas of soil contamination." *Hercules*, 247 F.3d at 717-18 (quotations omitted). It is difficult to prove divisibility when the

---

[9] Divisibility analysis "brings causation principles into the case—through the backdoor, after being denied entry at the front door." *United States v. Alcan Alum. Corp. (Alcan II)*, 990 F.2d 711, 722, (2d Cir. 1993) (quotations omitted). It "has the potential to eviscerate the strict liability principles of CERCLA," *Burlington Northern*, 520 F.3d at 940, "because defendants who can show that the harm is divisible . . . could whittle their liability to zero." *Township of Brighton*, 153 F.3d at 318. Thus, we have stated that divisibility is a "rare scenario." *Metropolitan Water*, 473 F.3d at 827 n.3.

facility functioned as a "dynamic, unitary operation" in which materials were moved from location to location during the production process. *Burlington Northern*, 520 F.3d at 958. Further, the "migratory potential" and "actual migration" of the resulting toxic substances can preclude a finding of divisibility. *See O'Neil*, 883 F.2d at 178-79. Commingling and cross-contamination will often indicate an indivisible facility. *See Alcan III*, 315 F.3d at 186.

Capital Tax's argument that the harm is divisible in this case is based entirely on property lines. Capital Tax argues that it cannot be liable for the two parcels of land that it does not own. But the EPA has broad discretion in defining the boundaries of a particular facility, and the boundaries are normally based on the extent of the contamination. *See Township of Brighton*, 153 F.3d at 313. The boundaries of the facility do not necessarily reflect property boundaries, *see id.*, and liability can extend beyond what the defendants actually own. *See Burlington Northern*, 520 F.3d at 943-44 (responsible party owned 19% of the facility); *United States v. Rohm & Haas Co.*, 2 F.3d 1265 (3d Cir. 1993) (responsible party owned 10% of the facility).

In the present case, contamination was found on almost every parcel of the facility. Further, all of these parcels are contiguous. Capital Tax's parcels are actually interspersed with Lerch's parcels. Parcels 8 and 10, which are owned by Lerch, formed the main mixing room and the pigment room. Parcel 9, which is owned by Capital Tax, contained the roller mill room and was situated right between Parcels 8 and 10. Doors connected the three parcels, and the roller mill room and the pigment room

both emptied out onto the storage yard. Further, Capital Tax owned the parcel to the north of Parcels 8 and the parcel to the south of Parcel 10. The EPA's Site Sketch reveals that, while containers were found all over the premises, many were concentrated on these three parcels and in the storage yard shared by Capital Tax and Lerch.

When the factory was in operation, materials passed through all these rooms at some point in the production process—that is, it was a "dynamic, unitary operation." *Burlington Northern*, 520 F.3d at 958. As the district court noted, Capital Tax's mistake is in attempting to apportion liability based on where the hazardous materials were located on the day they were removed. Those hazardous materials could easily have originated in another part of the plant. As in the game of "musical chairs," the fact that the chemicals came to rest in any particular place when production ended was largely happenstance. Thus, Capital Tax cannot show that the hazardous substances found just outside its property lines did not "originate" on its property. *Burlington Northern*, 520 F.3d at 938.

More importantly, there is undisputed evidence that the products and chemicals continued to migrate between parcels after operations at the facility had ceased. Containers were deteriorating and leaking. Indeed, paint and other chemicals mixed with rain water from the leaking roof and were washed to other parts of the building and onto the streets. Chemicals would evaporate into the air, leaving resin that could easily travel to contiguous parcels. Further, it is undisputed that individuals were

actually moving containers from parcel to parcel, spilling paint and other substances in the process. It is immaterial whether Capital Tax actually moved any of these containers because it failed to secure the premises from third parties and, in general, turned a blind eye to the property. Because we have commingling, cross-contamination and migration occurring on a site that formerly operated as a single, unitary operation, there is no basis for apportionment. *See Burlington Northern*, 520 F.3d at 956-58.

Finally, Capital Tax believes that the costs can be reasonably apportioned because the EPA tracked and documented all the containers that were removed from the site. We note that the relevant document does not appear to include the costs associated with cleaning the facility, excavating the contaminated ground or sealing off the tanks. Nor does it include travel costs, payroll costs, indirect costs, Department of Justice enforcement costs or interest. More importantly, the fact that containers were actually moved from parcel to parcel raises real doubts about the relevance of where all the containers of waste were on the date of removal. Put simply, a CERCLA owner may not move barrels of hazardous substances across property lines (or allow them to be so moved) in order to reduce its liability under CERCLA.

## IV.

Capital Tax also argues that the district judge erred in assessing costs and penalties based on the removal of waste from parcels 8 and 10. On August 15, 2003, the EPA issued a UAO directing Capital Tax to "perform

removal action within the Site which is owned by Respondent or to which Respondent has moved hazardous wastes." Capital Tax failed to comply with this order. CERCLA provides that any person "who, without sufficient cause, willfully violates, or fails or refuses to comply with, any order of the President under subsection (a) of this Section may . . . be fined not more than [$27,500] for each day in which such violation occurs or such failure to comply continues." 42 U.S.C. § 9606(b) (1). A "sufficient cause" for failing to comply is a reasonable belief that one is not liable under CERCLA. *See United States v. Barkman*, No. CIV. A. 96-6395, 1998 WL 962018, at *17 (E.D. Penn. Dec. 17, 1998). Because we are remanding this case to district court on the issue of liability, we find it appropriate to vacate the award of damages. The district court may reassess the issue of penalties, if it deems that action necessary, after resolving the liability issue.

## V.

For the reasons discussed above, the decision of the district court is VACATED and the case REMANDED for further proceedings in accord with this opinion.