NOTICE

Decision filed 03/18/20. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2020 IL App (5th) 180534-U

NO. 5-18-0534

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| *In re* ESTATE OF ROSE ANNE RIDER, Deceased | ) ) ) | Appeal from the Circuit Court of Gallatin County. |
| (Stephanie R. Rider, | ) ) | |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 13-P-1 |
| Todd Martin Rider, Stephanie Leigh Rider, and Jennifer B. Humphrey, | ) ) ) | |
| Defendants, | ) ) | |
| and | ) ) | |
| Damion Rider, Independent Administrator of the Estate of Rose Anne Rider, Deceased, | ) ) ) | Honorable |
| Defendant-Appellant). | ) ) | T. Scott Webb, Judge, presiding. |

_____

JUSTICE OVERSTREET delivered the judgment of the court.
Presiding Justice Welch and Justice Boie concurred in the judgment.

**ORDER**

¶ 1    *Held*: In suit for specific performance of an alleged oral agreement of decedent to devise real and personal property to plaintiff in return for services on her part, evidence convincingly and adequately established the agreement and complete performance by the plaintiff, by acts definitely referable to the contract, and change of the plaintiff's position in reliance upon the contract.

1

¶ 2    The plaintiff, Stephanie Rider, filed a complaint in the circuit court of Gallatin County alleging claims for breach of contract to make a will, injunctive relief, and *quantum meruit* against the estate of Rose Anne Rider (Anne), deceased. The defendant-appellant, Damion Rider, the independent administrator of Anne's estate, asserted that the plaintiff's claims were barred by the Frauds Act. See 740 ILCS 80/1 (West 2012) (bars the enforcement of any unwritten agreement not contemplating performance within the space of one year); *id.* § 2 (bars action charging any person upon any contract for interest in lands, for a longer term than one year, unless pursuant to a signed writing). The circuit court rejected Damion's defense, and after hearing evidence, entered judgment favoring the plaintiff on her claim for breach of contract to make a will.

¶ 3    On appeal, Damion argues that the circuit court erred in failing to bar the plaintiff's claim pursuant to the Frauds Act and in awarding the plaintiff Anne's home, home contents, and any proceeds remaining from the sale of Anne's vehicle. For the following reasons, we affirm the circuit court's judgment.

¶ 4                                    BACKGROUND

¶ 5    On May 17, 2012, Anne died intestate, leaving the defendants, Todd Martin Rider, who is also the plaintiff's husband, along with Stephanie Leigh Rider and Jennifer B. Humphrey, as heirs at law. On April 18, 2013, Damion, Stephanie Leigh's son and Anne's grandson, was appointed independent administrator of Anne's estate.

¶ 6    On July 11, 2013, the plaintiff filed her complaint alleging claims for breach of contract to make a will (count I), injunctive relief (count II), and *quantum meruit* (count III). In count I, the plaintiff alleged that in March 2011, Anne requested that the plaintiff care for Anne through house cleaning, taking her to appointments, grocery shopping, and performing other household

2

tasks. The plaintiff alleged that Anne also requested that plaintiff ensure that she was properly clothed and fed and would receive necessary medical and other care. The plaintiff alleged that in exchange, Anne orally promised to make a will leaving her home in fee simple, together with its contents, and her automobile to the plaintiff. The plaintiff alleged that in compliance with Anne's request, the plaintiff cared for Anne and her home until Anne's death. The plaintiff requested that the circuit court grant her title in fee simple to Anne's home and automobile, direct Damion to execute and deliver the deed to plaintiff in fee simple, and declare that Todd, Stephanie Leigh, and Jennifer had no interest, right, or title to the property. In count II of her complaint, the plaintiff sought an injunction preventing Damion from removing the plaintiff from Anne's residence or selling the residence. In count III, the plaintiff alternatively alleged a *quantum meruit* action seeking damages for the reasonable value of the services she provided to Anne.

¶ 7       On September 26, 2016, Damion filed a motion for summary judgment, arguing that the plaintiff's action for breach of contract to make a will was barred by sections 1 and 2 of the Frauds Act (740 ILCS 80/1, 2 (West 2012)). On April 19, 2017, the circuit court denied Damion's motion for summary judgment, holding that because the plaintiff fully performed her side of the alleged contract, the Frauds Act did not bar her action for breach of contract to make a will. The circuit court further held that the Frauds Act did not bar the plaintiff's action because the alleged agreement could have been fully performed within one year.

¶ 8       On May 10, 2018, the evidence presented at the bench trial included the following. Amanda Seely testified that she had known Anne for 20 years prior to Anne's death and that she visited Anne's home weekly or biweekly for two years prior to Anne's death. Amanda testified that during her visits, she witnessed the plaintiff regularly cleaning, grocery shopping, and taking Anne to her doctor's appointments. Amanda testified that the plaintiff also mowed Anne's lawn,

3

drove Anne to the beauty shop, and vacationed with Anne in Florida. Amanda testified that Anne had told her that the plaintiff had cared for her and that in the event of her death, the plaintiff "would receive everything she owned due to the fact that she had cared for her and would continue to do so." Amanda testified that Anne had stated that the plaintiff would receive Anne's house, car, and all of her belongings. Amanda testified that Anne made these statements at a cookout in the summer of 2011. Amanda testified that Anne repeated these statements in the plaintiff's presence during the 2011 Christmas season.

¶ 9    Amanda testified that she did not observe anyone other than the plaintiff completing household chores in Anne's home. Amanda testified that Damion and his family lived with Anne for a period of time, and the plaintiff babysat Damion's children four days per week, while Damion and his wife worked. Amanda testified that she babysat the plaintiff's children, while the plaintiff babysat Damion's children, because the plaintiff's children did not want to stay at Anne's home every day. Amanda testified that the plaintiff performed services for Anne prior to Damion and his family moving into Anne's home and after they moved from Anne's home.

¶ 10    Sherry Roman, a neighbor of Anne's and the plaintiff's and Todd's, considering that the plaintiff and Todd lived two blocks from Anne during Anne's life, testified that she had witnessed the plaintiff's vehicle parked at Anne's home, the plaintiff entering and exiting Anne's home, and the plaintiff caring for Anne from 2006 until Anne's death in 2012. Sherry testified that at a birthday party in 2011, Anne told her that the plaintiff would receive Anne's belongings, including her house, the contents, and car, as long as the plaintiff agreed to care for Anne. Sherry testified that prior to the birthday party in 2011, Anne had told her that the plaintiff cared for her and would receive "everything she had as long as [the plaintiff] agreed to keep taking care of her." Sherry testified that the plaintiff cleaned Anne's home, cooked for her, and transported her

wherever she needed to go. Sherry testified that she witnessed an increase in the plaintiff's care when Damion and his family moved into Anne's home because the plaintiff was caring for Damion's children too. Sherry testified that as far as she knew, the plaintiff continued to care for Anne, including driving her to and from the hospital.

¶ 11    Mary Lee Buckman testified that she had known the plaintiff since the plaintiff was a baby and had known Anne since the 1960s when she worked with her in a nursing home. Mary Lee testified that from 2010 through 2012, she would visit Anne weekly or biweekly. Mary Lee also testified that since 1993, she had lived within two blocks of Anne's home. Mary Lee testified that when she drove past Anne's home, which was about four times a day, she recognized the plaintiff's vehicle parked at Anne's home. Mary Lee testified that the plaintiff had previously driven her own children to school, but when she began helping Anne, Todd began driving their children to school. Mary Lee testified that approximately one year prior to Anne's death, Anne told her that "everything [Anne] [had] [was] going to go to [the plaintiff]" because the plaintiff had done so much for her. Mary Lee testified that Anne reiterated the sentiment probably four or five months before she died in May 2012.

¶ 12    Judy Clark testified that her son and the plaintiff's son attended school and played sports together when they were younger. Judy testified that she visited the plaintiff in Anne's home while the plaintiff was caring for Anne. Judy testified that the plaintiff mowed Anne's yard, took Anne to the doctor, and acquired groceries for Anne. With regard to the compensation for such a caretaker, Judy testified that when she assisted in the care of a man from 2010 until 2014, she was compensated $10, and later $12, an hour.

¶ 13    Julie Shaw testified that she worked as a licensed cosmetologist for 25 years and styled Anne's hair two to three times a week for probably 21 of those years. Julie testified that she

5

considered Anne as extended family, had styled Anne's children's hair, and had visited Anne's home numerous times. Julie testified that during her home visits, she witnessed the plaintiff preparing food for Anne, dressing Anne, and helping Anne with whatever she needed. Julie testified that the plaintiff stayed with Anne every day, and some nights, and acted as her main caregiver. Julie testified that in the five years prior to Anne's death, the plaintiff had driven Anne to her hair appointments. Julie testified that months before Anne died, Anne told her that because the plaintiff had driven her everywhere, she would receive Anne's vehicle and would be compensated in the end. Julie testified that Anne had stated that she planned to leave Damion $5. Julie acknowledged that when the plaintiff accompanied Anne to the beauty shop, Anne would pay for her to style the plaintiff's hair and that Anne had also paid for her to style the plaintiff's children's hair.

¶ 14    Karen Back testified that she had been a friend of Anne's for almost 50 years. Karen testified that in the last few years of Anne's life, her physical condition deteriorated, she coughed blood, and she experienced difficulty eating. Karen testified that during this time, Anne required assistance to bathe or use the bathroom.

¶ 15    Karen testified that she lived in Florida, and in February 2012, before Anne died in May, Anne and the plaintiff traveled to Florida to visit Karen and the beach. Karen testified that during the visit, she and Anne discussed how Anne's assets would be distributed upon death. Karen testified that Anne had stated that her children would receive $5 each and that she had agreed with the plaintiff to leave the plaintiff her house, its contents, and her car in return for the plaintiff agreeing to care for her for the rest of her life and that the plaintiff had agreed to do so. Karen testified that Anne also told her that when she died, the plaintiff would receive her house and the new car that she had purchased because the plaintiff needed a new car. Karen testified

that during the same February 2012 visit, she had asked the plaintiff whether she would receive the house and car for caring for Anne, and the plaintiff replied, "Yes, [t]hat's what [Anne] has said."

¶ 16    Karen testified that during the plaintiff's and Anne's stay in Florida, the plaintiff helped Anne with everything. Likewise, Karen testified that when she visited Anne in Anne's home, she witnessed the plaintiff caring for Anne, cooking her meals, bathing her, shopping for her, and taking her to the doctor. Karen testified that the plaintiff also cared for Damion's children in Anne's home because Anne was not well enough to care for them alone. Karen testified the plaintiff helped Anne five to seven days per week.

¶ 17    Bernice Milletello, pursuant to an evidence deposition taken on May 7, 2018, testified that she was 78 years old and had been a friend of Anne's since the first grade. Bernice testified that in fall 2011, she had visited with Anne, and Anne had told her that she was giving her house, the furniture, and her vehicle to the plaintiff and that Todd and her other children would receive $5. Bernice testified that she and Karen Back had later visited Anne in the hospital shortly before Anne's death. Bernice testified that she had told Anne to execute a will, and Anne had replied that she was leaving everything to the plaintiff. Bernice testified that Anne had explained that she had told the plaintiff that if the plaintiff stayed with her until she died, she would give everything to the plaintiff.

¶ 18    Bernice testified that from 2009 through 2011, she visited Gallatin County about once or twice a year. Bernice testified that she spoke to Anne on the phone about three times a week. Bernice testified that the plaintiff cleaned Anne's home, purchased groceries for Anne, and cared for Damion's children. Bernice testified that Anne gave the plaintiff "a little bit of money" to

clean the house and do the chores but did not pay the plaintiff's bills. Bernice testified that Anne gave the plaintiff about $40 to clean, even though Anne's house was big.

¶ 19 Damion Rider testified that he lived with his family in Anne's home from 2009 until 2011. Damion testified that the plaintiff visited Anne's home three to five days a week, assisted Anne with appointments, and cleaned the home. Damion testified that while living with Anne, Anne had agreed to care for his children, but the plaintiff became their caregiver. Damion acknowledged that the plaintiff also performed caretaking chores for Anne, including cleaning her house, cooking, taking her to doctor and hair appointments, grocery shopping, and mowing.

¶ 20 Damion testified that Anne paid many of the plaintiff's bills. Damion testified that when the plaintiff accompanied Anne to appointments, Anne bought her purses and jewelry and paid to eat together at restaurants. Damion testified that Anne also paid the plaintiff's household bills.

¶ 21 Damion testified that in the summer of 2009, he spoke to Anne about moving into Anne's home and about Damion receiving Anne's home. Damion testified that once he and his wife moved into the home, Anne directed them to choose flooring and paint colors to remodel the home since it would ultimately become theirs. Damion testified that they subsequently moved from Anne's home to live closer to their employers. Damion acknowledged that when he moved from the home, Anne provided $10,000 and that he did not pay her back.

¶ 22 Lawrence Dailey, Anne's brother, testified that from the 1990s until 2012, he visited with Anne two or three days a week. Lawrence testified that he witnessed the plaintiff at Anne's home caring for her and that he witnessed Anne paying the plaintiff with cash and checks.

¶ 23 Jennifer, Anne's daughter, testified that she graduated high school in 1986 and moved from home in 1987. Jennifer testified that she returned to live with Anne from 2003 to 2007, but

moved to the Springfield area thereafter. Jennifer testified that she returned to visit her mother for a week every month until 2008.

¶ 24   Jennifer testified that in 2002, Todd and Stephanie had executed a contract-for-deed to purchase Jennifer's home, where they had lived until moving into Anne's home. Jennifer testified that during the year prior to Anne's death, she traveled with Anne to Florida, New Orleans, and San Antonio. Jennifer testified that she cared for Anne during her visits to Gallatin County, in order to provide the plaintiff an opportunity to be with her own family.

¶ 25   Jennifer testified that she witnessed Anne handing cash and checks to Todd, the plaintiff, and Damion. Jennifer testified that Anne also paid for haircuts for Todd, the plaintiff's children, and Jennifer's oldest daughter. Jennifer testified that when Anne entered the hospital during her final stay, she stayed with Anne for three nights. Jennifer testified that the plaintiff had been staying with her every night and needed to go home and take a break. Jennifer testified that Anne died after a week or 10 days in the hospital. Jennifer acknowledged that the plaintiff cared for Anne until Anne's death.

¶ 26   Jennifer testified that after Anne's death she took from Anne's home documents, one of which was an undated, handwritten document revealing Anne's handwriting. Jennifer identified the document and testified that the document indicated that Anne planned to give her car to the plaintiff, her house to Damion, and various jewelry pieces to other family members. Jennifer acknowledged that the document referenced a "gold band diamond, Grandma B." which Anne had given to Jennifer during their trip to New Orleans in the fall of 2011.

¶ 27   On October 10, 2018, the circuit court entered its judgment, noting that the evidence remained uncontroverted that the plaintiff provided care for Anne during the final few years of her life. The circuit court found that the caregiving began around 2006-2007, and that, pursuant

9

to the plaintiff's claims, in 2011, the plaintiff and Anne entered into a contractual agreement, wherein the plaintiff agreed to care for Anne in exchange for Anne bequeathing the plaintiff her vehicle, home, and home contents when she died. The circuit court noted that there was no evidence that Anne consistently paid the plaintiff and limited testimony that Anne purchased groceries and haircuts for the plaintiff. The circuit court noted that witnesses testified seeing Anne give the plaintiff money but found the evidence vague in that the testimony did not include dollar amounts or how often this occurred. The circuit court concluded that the plaintiff was not consistently compensated, and therefore, it was unnecessary for the plaintiff to demonstrate a change in position. Even so, the circuit court found that the evidence supported a conclusion that the plaintiff changed her position during the final few years of Anne's life, when Anne's health was failing and she required additional care.

¶ 28 The circuit court held that the plaintiff had provided services above and beyond what a normal, reasonable daughter-in-law would have provided, given the lack of consistent compensation provided to her, and that the plaintiff cared for Anne's every need, every day of Anne's life. The circuit court found that the plaintiff had sacrificed time with her children and husband to meet Anne's needs. The circuit court concluded that the facts of the case could not reasonably be harmonized with any other theory than that the work was done for the alleged promise. Thus, the circuit court held that the plaintiff proved by clear, explicit, and convincing evidence that the plaintiff and Anne had entered a contract to make a will and awarded Anne's home and property to the plaintiff. On October 31, 2018, Damion filed a timely notice of appeal.

¶ 29                                    ANALYSIS

¶ 30 On appeal, Damion argues that because the alleged March 2011 agreement anticipated a relationship lasting longer than one year, considering that Anne died in May 2012, it was barred

10

by section 1 the Frauds Act. 740 ILCS 80/1 (West 2012) (bars the enforcement of any unwritten agreement not contemplating performance within the space of one year). Damion also argues that because the plaintiff's action involved real property to be conveyed absent a written instrument, it was barred by section 2 of the Frauds Act. *Id.* § 2 (no action shall be brought to charge any person upon any contract for interest in lands unless pursuant to a signed writing).

¶ 31    "In Illinois, oral contracts are not considered void [citation], although they may be unenforceable if they are subject to a Statute of Frauds provision." *Meyer v. Logue*, 100 Ill. App. 3d 1039, 1043 (1981). The Frauds Act, also commonly referred to as the Statute of Frauds, is designed to prevent false claims by requiring a writing to evidence the parties' contractual intent. *Noesges v. Servicemaster Co.*, 233 Ill. App. 3d 158, 163 (1992). The legislature has enacted such provisions for, *inter alia*, contracts that cannot be performed within a year (740 ILCS 80/1 (West 2012)) and contracts for the sale of an interest in land (*id.* § 2). Neither of these statutes "explicitly provide[s] that full performance by one party operates to take the oral contract out of the Statute of Frauds; however, case law fully supports this result." *Meyer*, 100 Ill. App. 3d at 1044; see also *Mapes v. Kalva Corp.*, 68 Ill. App. 3d 362 (1979) (executed oral employment contract withstands Statute of Frauds defense, especially where all that remains to be done by the other party is payment of money); *Thomas v. Moore*, 55 Ill. App. 3d 907 (1977) (oral contract for sale of real estate is removed from Statute of Frauds where purchaser pays full consideration, takes possession of the land, or makes valuable improvements thereon); *Lund v. E.D. Etnyre & Co.*, 103 Ill. App. 2d 158 (1968) (where one party has fully performed oral agreement, other party is estopped to rely on the Statute of Frauds, even though the oral contract violates the statute); *Hills v. Hopp*, 287 Ill. 375 (1919) (oral contract for sale of corporate stock was enforceable because plaintiff performed all of his obligations in reliance on it).

¶ 32 "The rationale of this unilateral full performance concept is sound; if one party, in reasonable reliance on the contract, performs all of his obligations and cannot be adequately compensated through restitutionary means, the other party should not be permitted to rely on the Statute of Frauds as a way to avoid his reciprocal obligations." *Meyer*, 100 Ill. App. 3d at 1043. Statute of Frauds provisions are designed to prevent false claims by requiring a writing to evidence the parties' contractual intent. *Id.* "When one party fully performs his part of the alleged oral contract, however, the courts recognize that this very performance strongly indicates the existence of a contract." *Id.* at 1043-44. Such performance tends to minimize the dangers that the Statute of Frauds provisions were designed to prevent. *Id.* at 1044. "Conversely, where an alleged contract is purely executory, neither side having performed, application of the Statute of Frauds is justified by the attendant proof problems and the increased likelihood of perjury." *Id.*

¶ 33 "The cases allowing specific performance to enforce an oral contract to will or devise property to another, in consideration of services to be rendered, are universally those in which a gross fraud would be suffered by the promisee if specific performance were denied." *Wessel v. Eilenberger*, 2 Ill. 2d 522, 527 (1954). "The courts of equity will not permit the Statute of Frauds, the only purpose of which is to prevent fraud, to be used where the effect will be to accomplish a fraud, and if the facts are such that it would be a virtual fraud to permit the defendant to interpose the statute, a court of equity will not listen to that defense." *Id.*

¶ 34 In the present case, the evidence revealed that the plaintiff, in reliance on Anne's promise to devise real and personal property to her, fully performed daily caretaking services for Anne until Anne's death, pursuant to their oral agreement. Because such facts lead to a virtual fraud if the estate is permitted to interpose the Statute of Frauds, we find that the circuit court properly rejected it as a defense to the plaintiff's action.

12

¶ 35　On appeal, Damion also argues that the circuit court erred in finding that the plaintiff and Anne had entered into an oral contract to make a will, that plaintiff changed her position in reliance upon the oral promise, that the plaintiff relied on the oral promise to her detriment, and that the evidence showing that the plaintiff provided said services cannot reasonably be harmonized with any other theory than the services were provided for an alleged oral promise to make a will.

¶ 36　An oral contract to make a will, supported by valid and adequate consideration, may be valid and enforceable. See *Burke v. Burke*, 12 Ill. 2d 483 (1957); *In re Estate of Nelson*, 103 Ill. App. 3d 640, 642 (1981). Such a contract "is sufficiently definite and certain to be enforceable if the court is enabled from the terms and provisions thereof *** to ascertain what the parties have agreed to do." (Internal quotation marks omitted.) *Pritchett v. Asbestos Claims Management Corp.*, 332 Ill. App. 3d 890, 896 (2002). In a suit for specific performance of an oral contract to make a will, the evidence of the existence of the contract and its terms must be clear and explicit and "so convincing that it will leave no doubt in the mind of the court." (Internal quotation marks omitted.) *In re Estate of Spaulding*, 187 Ill. App. 3d 1031, 1036 (1989).

¶ 37　Courts accept with caution evidence offered in support of a contract to make a disposition of property of a deceased person different from that provided by law. *Jatcko v. Hoppe*, 7 Ill. 2d 479 (1955). Mere expressions of testamentary intent are insufficient to establish an oral contract to will or devise property to another. *In re Estate of Nelson*, 103 Ill. App. 3d at 642. Nevertheless, "[a] contract to make a will may be proved by declarations and conduct of the parties not in the presence of each other." *In re Estate of Niehaus*, 341 Ill. App. 454, 459 (1950). Moreover, "[c]laimant's acceptance of the contract may be shown by circumstantial evidence, direct proof is not essential." *Id.*

13

¶ 38 Specific performance is not a matter of right, but rests in the sound discretion of the court, to be determined from all facts and circumstances. *Jatcko*, 7 Ill. 2d at 485. The credibility of witnesses and the weight to be accorded their testimony are within the province of the trier of fact, and the trial court's judgment will not be reversed unless its findings are against the manifest weight of the evidence. *In re Estate of Niehaus*, 341 Ill. App. at 459; *In re Estate of Kucharski*, 3 Ill. App. 3d 32, 36 (1971).

¶ 39 In *In re Estate of Niehaus*, 341 Ill. App. 454, the claimant alleged that the decedent promised to make a will in her favor, leaving her his entire estate, on the condition she would continue to remain in his home, after the death of his wife, who had been the claimant's aunt, and care for him. *Id.* at 456. As in this case, the claimant presented the testimony of many witnesses to support her claim. *Id.* The evidence showed that she had lived with her uncle for more than 25 years, postponing marriage at the decedent's request, and that she had cared for him until his death. *Id.* Based upon the testimony and the fact that the claimant's full and complete performance was uncontradicted, the court found that the evidence sufficient to justify the trial court's finding that the essential terms of the oral contract to devise property were clearly established. *Id.* at 459.

¶ 40 Similarly, in *Holmes v. Ackley*, 400 Ill. 372 (1948), the decedent's step-granddaughter sought to enforce an oral agreement wherein the decedent agreed to devise certain real property to her. The evidence revealed that the claimant had moved into the decedent's home and performed considerable service for the decedent in the last months of her life. *Id.* at 377. As in this case, witnesses testified to the decedent's statements that if the claimant stayed with her for the rest of her life, the decedent would give the claimant her home. *Id.* The court concluded that

14

the activities of the parties and the statements of the decedent were sufficient to establish the existence and terms of the contract. *Id.*

¶ 41   Likewise, in *Skurat v. Kellerman*, 53 Ill. App. 3d 361 (1977), the plaintiff left Chicago at her uncle's request to live on his farm, cook, clean and care for him in his old age, work in the fields, and care for livestock and poultry. *Id.* at 365. The plaintiff cared for her uncle for "virtually" 10 years before he died. *Id.* During that time, the plaintiff's uncle had told "numerous people" that he was going to will her the farm. *Id.* The trial court awarded specific performance of the agreement to make the will. *Id.* On appeal, the appellate court affirmed, stating that it could "infer from the facts and conduct of the parties including the statements of the deceased to other people, that the farm was to be given to plaintiff if she cared for decedent." *Id.* at 365-66.

¶ 42   In this case, the record supports all of the elements for a valid oral contract to make a will. The evidence established that in 2011, Anne had told the plaintiff, and numerous other witnesses, that she would devise her home, its contents, and her vehicle to the plaintiff in exchange for plaintiff's care until her death. Specifically, both Karen and Bernice testified that Anne had stated to them that the plaintiff had agreed to these terms. The evidence further supported the circuit court's conclusion that Anne's need for care increased in the last years of Anne's life, and the plaintiff was required to sacrifice time with her children and husband in her own home in order to assist Anne pursuant to the agreement. As further noted by the circuit court, there was no evidence of consistent compensation to the plaintiff for caring for Anne. *Cf. Cain v. Hougham*, 116 Ill. App. 2d 439, 445 (1969) (plaintiff claiming breach of agreement to make will had been compensated daily). The terms of the agreement between the plaintiff and Anne were sufficiently definite and certain to constitute a valid and enforceable oral contract to make a will, and the facts cannot be reasonably harmonized with any other theory than the work

15

was done for the alleged promise. The evidence before the circuit court was clear, explicit, and convincing in its probative force. Thus, the circuit court properly entered judgment in favor of the plaintiff, awarding her Anne's home, its contents, and the remaining proceeds of Anne's vehicle on this basis, and we need not address the parties' arguments with regard to plaintiff's *quantum meruit* claim.

¶ 43                            CONCLUSION

¶ 44     For the reasons stated, we affirm the judgment of the circuit court of Gallatin County.

¶ 45     Affirmed.